AUTO-TERIA, INC. *v.* JACK E. AHERN; STEPHEN M. SUHRE.
[No. 2-1173A249. Filed July 27, 1976. Rehearing denied August 31, 1976. Transfer denied February 4, 1977.]

*Merrill Moores, John L. Price,* of Indianapolis, for appellant.

*William M. Evans, Bose McKinney & Evans,* of counsel, of Indianapolis, for appellees.

### CASE SUMMARY

LOWDERMILK, J.—The instant case was transferred from the Second District to this office on July 1, 1976, in order to lessen the disparity in caseloads between the Districts.

Plaintiff-appellant Auto-Teria, Inc., appeals from a judgment of $10,220.27 on the counterclaim of defendants-appellees Jack E. Ahern and Stephen M. Suhre (buyers) and $2,000 on the counterclaim of Suhre individually

We affirm.

### FACTS

The facts most favorable to the appellees reveal that in 1969 buyers, certified public accountants, were interested in a self-service car wash business. They contacted Del O. Amy, president of Auto-Teria, an Indianapolis manufacturer of automatic carwash equipment, because they felt buying locally would facilitate repair and the acquisition of spare parts and because Auto-Teria sold one of the few coin-operated systems on the market.

They communicated to Amy their desire to invest in a business that would require little of their time; they specifically wanted a unit which would not require the presence of an operator-repairman.

During the course of negotiations Amy gave them Auto-Teria's newsletter and an advertising brochure and sent them a letter—all describing Auto-Teria's brush-type coin-operated carwash.

The "President's Report" in the newsletter concluded:

"The coin car wash industry has graduated to a new level with many installations totaling $150,000 or more. With the perpetual ideas and equipment improvements, I foresee a market for the investor that will be unsurpassed in: 1. LABOR PROBLEMS; 2. OWNER TIE-DOWN REQUIREMENTS; 3. RETURN ON THE INVESTED DOLLAR." (Original emphasis.)

The front page of the three-color illustrated brochure depicted a "talking coin-meter" and emphasized: "Automatic — Coin Operated — No Hand Wash Labor." At the bottom of the back page — in the smallest type used on that page — appeared the statement:

"Inasmuch as the quality of car wash is contingent upon so many factors beyond the control of Auto-Teria, Auto-Teria cannot guarantee such or rectify damage to car, such being the responsibility of attendant.

"Manufacturer reserves right to substitute equal or superior components for equipment mentioned.

*"Quality and quantity of equipment vary according to model ordered."* (Original emphasis.)

The letter from Amy stated, omitting pleasantries:

"I believe you will agree that the coin operated car wash business is one of the most profitable investments on the market today, with the least amount of hired help requirements.

"I have experienced the sale of many types of equipment all over the world and for this reason feel you should compare equipment very closely because maintenance can become a major problem with piston pumps and poor design. Purchasing the right car washing facility is merely COMMON SENSE, like so many other facets of life.

"THERE IS NO MAGIC implied by AUTO-TERIA except that we usually offer more capacity in the component parts than any other equipment on the market today. If you will compare AUTO-TERIA'S gear capacity, electric motor

horse power ratings and brush sizes you will quickly see that the reason Auto-Teria facilities give you a greater return on your investment is—a better wash and a more satisfied customer.

"REMEMBER, the customer only sees the end results . . . . AUTO-TERIA'S QUALITY *DOES* PAY . . ." (Original emphasis.)

Amy took the buyers to the factory where the brush units were being assembled and showed them a model unit. He then took them to a four-bay installation in Noblesville where, he said, the operator had generated business of $700 to $800 a month with only self-service equipment which customers must hold to operate.

Buyers and Auto-Teria executed an "Order Form and Sales Agreement" for an automatic brush unit installed in one of the bays of the Noblesville facility plus the used self-service equipment which was to be "completely checked out and put in working order."

Buyers received a photocopy of the form—but no written warranty until later. The buyers drew two notes payable to Auto-Teria, the fact amount of one being $64,789.20 and the other $2,527.20.

After the brush unit was installed, buyers could not get the coin meter to work properly and therefore disconnected it — so that an attendant had to be present to operate the unit.

Buyers then discovered that the brushes were working too fast and were ripping mirrors and antennas off customers' cars, and that the various phases of the wash cycle were out of time.

Inasmuch as repeated calls to Amy failed to produce any repair response, buyers turned to Byford Thompson, who owned and operated an Auto-Teria installation in Anderson and who had worked for the manufacturer in the assembly and installation of buyers' unit. Thompson added mechanisms to slow the brushes; got the system back "in cycle", and allevi-

ated the breakage problem by moving the brushes out — in which position they did not effectively wash autos.

Thompson had to repair the automatic unit two to five times per month inasmuch as it would not perform for any extended period of time.

Buyers moved the brush unit to a Nora gas station, where, they hoped, the station personnel could operate it and repair it. However, it worked no better.

While Suhre was operating the unit at the Nora station, the top brush unaccountably began falling toward an auto being washed. To prevent the brush from damaging the car, Suhre reached up to push a button which stopped the brush. As he did so a finger on his left hand was broken in three places when it was caught between the unit and the doorway through which it was passing.

As a result of this "painful" injury the left-handed accountant was treated at a hospital and was unable to work for a period of time.

When winter struck buyers learned that the system to keep water flowing through the self-service units at Noblesville had not been put in working order by Auto-Teria. As a result, the water froze in the pipes and hoses—bursting them.

Only in two months did the carwash produce the business reported by Amy.

In the summer of 1970 buyers returned the brush unit to Noblesville, from where Auto-Teria took possession of it.

Of all the equipment purchased by buyers, Auto-Teria was able to resell only the brush unit. It was sold for $5,500 or $5,600—after Auto-Teria spent $2,500 to $3,500 to put it into saleable condition.

Buyers paid only $9,720.27 on the notes, upon which Auto-Teria sued. Buyers jointly counterclaimed for damages as a result of the transaction; Suhre also counterclaimed for damages for his personal injury.

Following the post-trial entry of judgment for buyers on their counterclaims, present counsel for Auto-Teria entered his appearance between 3:30 and 4:00 P.M., June 4, 1973, and filed a "Motion to Correct Errors." He personally applied to the pleadings the file stamp located in the trial court's office. Later he learned that the stamp read: "FILED June 5, 1973."

On June 4, 1973, it was the everyday practice of the room clerk assigned to the trial court to leave at 3:30 P.M., which was before the trial court closed. It was also her practice to move the file stamp ahead to the next business day before leaving.

## ISSUES

1. Whether the trial court erred in not changing its records to show a filing date of June 4, 1973, for Auto-Teria's "Motion to Correct Errors."

2. Whether the trial court erred in its handling of Auto-Teria's Exhibits D and E.

3. Whether the trial court erred in rendering judgment for buyers, jointly.

4. Whether the trial court erred in rendering judgment for Suhre individually.

5. Whether the trial court denied Auto-Teria a fair trial by conducting a portion of the proceedings outside the regular courtroom.[1]

## DECISION

ISSUE ONE:

Before discussing the merits of Auto-Teria's appeal we must resolve whether the trial court erred in denying Auto-Teria's

---

[1]. Appellant also asserts that the trial court abused its discretion in entering a default judgment against Auto-Teria after it filed a timely answer to buyers' counterclaims. The record contains only an "Entry of Default"—but no judgment based thereon.

If there was in fact a default judgment entered, trial counsel for Auto-Teria did not pursue his remedy: a timely motion for relief from judgment pursuant to Ind. Rules of Procedure, Trial Rule 60(B)(4). See also *Fitzgerald* v. *Brown* (1976), 168 Ind. App. 586, 344 N.E.2d 309.

"Petition for Correction of Error," which sought to have the record altered to show that Auto-Teria's "Motion to Correct Errors" was filed on June 4, 1973, rather than on June 5, 1973.

The trial court entered its judgment in favor of buyers on April 4, 1973. The sixtieth day following that entry was Sunday, June 3, 1973.

Therefore, the latest date on which Auto-Teria could file a timely motion to correct errors—and thereby preserve its right to appeal—was June 4, 1973. Ind. Rules of Procedure, Trial Rule 6(A), Trial Rule 59(C), and Trial Rule 59(G).

"Clerical mistakes" in all parts of the record may be corrected at any time by the trial court—*sua sponte* or upon the motion of any party. Ind. Rules of Procedure, Trial Rule 60(A).

This provision is analyzed at 4 Harvey and Townsend, *Indiana Practice* 205-206 (1969):

> "The types of 'clerical mistakes' . . . which may be corrected under Rule 60(A) will be controlled in a large measure by prior Indiana case law—law which is no haven for the lawyer seeking precise rules and answers. Prior case law distinguished between a motion to correct clerical errors and the procedure for correcting inconsistencies between the verdict or finding and the judgment, and between the evidence and the verdict, findings or judgment. . . .
>
> ". . . [C]lerical errors or mechanical mistakes involved in the process of making computations, spelling, transcribing or making entries into the records of the court by the judge or other court officer could be corrected at any time. It is this type of error or mistake within the ambit of Rule 60(A). Prior Indiana case law allowing the correction at any time of mistakes in the mathematical calculation of damages, in spelling or omission of names, mis-descriptions of real estate and the like appearing in the judgment or other records of the court will remain important under Rule 60(A). . . ." (Citations omitted.)

Our Supreme Court in *Jenkins* v. *Long* (1864), 23 Ind. 460, 461-462, dealt with a clerk's computation error which was entered in the record:

"Two questions only are presented for our consideration by the argument of the appellant: 1. Could the correction be made after the expiration of one year from the rendition of the judgment? 2. Was the extrinsic evidence admissible? . . .

"1. The statute relied on by the appellants we suppose to be section 99 of the code, which authorizes the court, within a year, to relieve a party from a judgment taken against him, . . . and supply an omission in any proceedings. But we do not think this statute at all applicable to the question. It was not sought to supply any 'omission' in the proceedings, for on their face they were regular and complete, but simply to correct a clerical error of commission. The inherent power of the court was invoked—a power much older than the code—to make its record speak the truth as to what it had done, upon the suggestion that its ministerial officer, by mistake, had not correctly recorded its judgment actually rendered. . . .

"2. Was any evidence admissible, upon the hearing of the motion, outside of the judgment sought to be amended? This question can receive only an affirmative answer. It would be in vain to seek relief against a clerical error, unless such error may be shown to exist; and the instances would be rare indeed in which the error would be apparent upon the face of the record itself. . . .(Citation omitted.)

It is clear that the error in the case at bar was "clerical" although counsel for Auto-Teria was involved in making it. 6 A *Moore's Federal Practice,* § 60.06[3] (2d Ed. 1966). See also Annot., 13 A.L.R. Fed. 794, § 4 (1972).[2]

Buyers, of course, seek to short circuit Auto-Teria's appeal by asserting the propriety of the trial court's refusal to grant relief under TR. 60(A). They argue that changing the date of filing of Auto-Teria's "Motion to Correct Errors" would have been an improper *nunc pro tunc* entry by the trial court.

The purpose of a *nunc pro tunc* entry is to insert into the record some court action which was mistakenly omitted from

---

2. In interpreting TR. 60(A) we may look to federal decisions construing the Federal Rule after which TR. 60(A) was patterned. *Bryant* v. *Lake County Trust Co.* (1975), 166 Ind. App. 92, 334 N.E.2d 730.

the record. There generally must be some writing upon which to base the amendment, *State ex rel. Jackson* v. *Owen Circuit Court* (1974), 160 Ind. App. 685, 314 N.E.2d 73, so that "entries may not be entered nunc pro tunc from thin air." *Blum's Lumber and Crating, Inc.* v. *James* (1972), 259 Ind. 220, 223, 285 N.E.2d 822. Our Supreme Court held that where the written memorial relied upon does not on its face disclose an error in the record, the court cannot consider extrinsic evidence in making a *nunc pro tunc* entry. *Cook* v. *State* (1941), 219 Ind. 234, 37 N.E.2d 63.

In the case at bar, the record contains a written entry that could have been corrected. It is uncontroverted that on June 4, 1973, Auto-Teria's "Motion to Correct Errors" did exist and had been filed with the trial court.

Therefore the trial court, by granting the relief requested under TR. 60(A), would not have entered in its record a fact that did not exist at the time specified in the entry. *Jenkins* v. *Long, supra,* establishes that the rule in *Cook* v. *State, supra,* does not apply where there is a clerical error of commission rather than an omission.

Although relief under TR. 60(A) is clearly within the discretion of the trial court, we conclude that the trial court should have corrected its record to make it speak the truth where the only evidence before it indicated that a clerical error had been committed and where a refusal of relief deprived Auto-Teria of its right to appeal. See *Soft Water Utilities, Inc.* v. *LeFevre* (1973), 261 Ind. 260, 301 N.E.2d 745.

ISSUES TWO, THREE AND FOUR:

We shall deal with several of appellant's assertions of error in one discussion, pursuant to Ind. Rules of Procedure, Appellate Rule 8.3(A)(7). Inasmuch as the transaction between the parties came within the scope of the Uniform Commercial Code,[3] *Abbett* v. *Thompson* (1970), 148 Ind. App. 25, 263

---

3. IC 1971, 26-1-1-101 through 26-1-10-105 (Burns Code Ed.)

N.E.2d 733, we shall refer to that statute as the UCC and cite it by UCC section number for the sake of brevity.

Auto-Teria contends that buyers' actions with respect to the goods in question constituted an acceptance rather than an effective rejection—so that buyers became obligated to pay the agreed price. §§ 2-602, 2-606(1) (b)-(c), 2-607(1).

Assuming without deciding that Auto-Teria's argument is correct, buyers' remedy for breach of warranty by Auto-Teria remained viable. §§ 2-607(2), 3-306. See *Melody Home Manufacturing Co.* v. *Morrison* (Tex. Civ. App. 1973), 502 S.W.2d 196, 13 UCC Rep. Serv. 1035 (Writ of Error Ref.).

A prerequisite to this post-acceptance remedy is notice of breach to the seller within a reasonable time after the buyer discovers or should have discovered said breach. § 2-607(3)(a). Inasmuch as buyers complained to Auto-Teria about the brush unit immediately after its installation and about the self-service equipment after it burst, the trial court could have concluded that the notice requirement was satisfied.

By making any promise or affirmation of fact relating to the goods, or by giving any description of the goods, or by showing any sample or model, a seller creates an express warranty that the goods shall conform to the promise, affirmation, description, sample, or model—so long as these acts go to "the basis of the bargain" with the buyer. § 2-313(1). No specific intent or formal words are necessary for a seller to create an express waranty. § 2-313(2).

By model, by description in the advertising brochure, and by affirmation of fact in Amy's letter, spoken words, and printed words in the newsletter, the trial court could have found that Auto-Teria created an express warranty that its brush unit could be automatically operated by a customer's deposit of coins in the meter, rather than by an attendant. Inasmuch as buyers entered the transaction with just such a

system in mind, the trial court could have found that Auto-Teria's acts went to the basis of the parties' bargain.

Auto-Teria's promise to put the used self-service equipment into working order so as to prevent freezing and bursting could have been found to create another express warranty going to the basis of the bargain, inasmuch as the parties added the promise to the written document of sale.

- We turn now to the UCC implied warranties which this court discussed in *Woodruff* v. *Clark County Farm Bureau Cooperative Assoc. Inc.* (1972), 153 Ind. App. 31, 42, 43, 286 N.E.2d 188:

"These implied warranties of merchantability and fitness for a particular purpose do not arise out of an agreement between the parties; they may even exist when no specific promise has been made by the seller to the buyer. . . . Thus, they are imposed *by operation of law* for the protection of the buyer, and they must be liberally construed in favor of the buyer. . . ." (Original emphasis; citations omitted.)

A merchant seller impliedly warrants that his goods are, *inter alia,* "fit for the ordinary purposes for which such goods are used"—unless he takes action to modify or exclude the warranty. § 2-314(1), (2) (c).

Therefore the trial court could have held Auto-Teria to an implied warranty of merchantability that the brush unit would effectively wash automobiles without knocking off their exterior accessories.

Section 2-315 provides:

"*Implied warranty — Fitness for particular purpose.* — Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose." (Original emphasis.)

Where a buyer communicated to a seller the particular purpose for which the sellers' goods were to be used this court

found an implied warranty of fitness for that particular purpose. *Jerry Alderman Ford Sales, Inc.* v. *Bailey* (1972), 154 Ind. App. 632, 291 N.E.2d 92.

An Indiana user of goods benefitted from an implied warranty of fitness for a particular purpose where the goods had been advertised expressly for the use to which they were put. *Filler* v. *Rayex Corp.* (7th Cir. 1970), 435 F.2d 336.

Therefore the court could have found—based either on the discussions between the parties or on the advertising brochure —an implied warranty that the brush unit would be fit for automatic coin operation by customers.

This warranty could have been cumulative with the first express warranty, *supra.* § 2-317 (c).

For the disclaimer in fine print at the bottom of the back page of the advertising brochure to exclude or modify the implied warranties, *supra,* it must be conspicuous—e.g. in larger type, or contrasting in type or color. §§1-201 (10), 2-316 (2). Therefore the court could have found that this statement did not affect Auto-Teria's implied warranties.

Although the declaration in Amy's letter—that Auto-Teria implied no "magic"—could have been held to be conspicuous, it does not mute or destroy the implied warranties. It must mention merchantability to affect the implied warranty of merchantability. To exclude the warranty of fitness for a particular purpose it must state, "for example, that 'There are no warranties which extend beyond the description on the face hereof.'" § 2-316(2). Nor is there any "as is" or "with all faults" language which would exclude either implied warranty. § 2-316 (3) (a). This court will not favor disclaimers of implied warranties, but will construe them against a seller for reasons of public policy. *Woodruff* v. *Clark County Farm Bureau Cooperative Assn., Inc., supra.*

Neither statement affects Auto-Teria's express warranties, for "if it is unreasonable or impossible to construe the lan-

guage of the express . . . warranty and the language of the disclaimer as consistent, the disclaimer becomes inoperative." *Woodruff* v. *Clark County Farm Bureau Cooperative Assoc., Inc.,* at 153 Ind. App. 52, interpreting § 2-316 (1).

The trial court could have held Auto-Teria's written warranty (Exhibit E, *infra*) to be outside the contract between the parties inasmuch as it was not given to buyers until after the purchase was completed. *Zoss* v. *Royal Chevrolet, Inc.* (Ind. Super. 1972), 11 UCC Rep. Serv. 527.

Inasmuch as the brush unit could not be automatically operated by a customer's deposit of coins and would not effectively wash cars without damaging them, the trial court could have found a breach of Auto-Teria's express and implied warranties. And the trial court could have held Auto-Teria in breach of its other express warranty inasmuch as the self-service equipment froze and burst as a result of Auto-Teria's failure to put it into proper working condition.

Auto-Teria argues that it cannot be held accountable for Suhre's injury in that Suhre produced no evidence showing that Auto-Teria sold the brush unit in a defective condition—as required by § 402 A, *Restatement, 2d of Torts,* which is the Indiana standard for strict products liability adopted by our Supreme Court in *Ayr-Way Stores, Inc.* v. *Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335.

Auto-Teria overlooks the extension of the UCC breach of warranty remedy to personal injury of a buyer. §§ 2-714(3), 2-715 (2) (b). See *Filler* v. *Rayex Corp., supra.*

Auto-Teria attacks the judgment of $10,220.27 for the buyers jointly and $2,000 for Suhre on the ground that neither amount appears in the record. This court will not require breach of warranty damages to be proved by mathematical precision; any reasonable manner of proof is permitted. *Bob Anderson Pontiac, Inc.* v. *Davidson*

(1973), 155 Ind. App. 395, 293 N.E.2d 232. And where doubt exists as to the exact proof of damages, we will resolve the uncertainty against the wrongdoer. *Gene B. Glick Co., Inc.* v. *Marion Construction Corp.* (1975), 165 Ind. App. 72, 331 N.E.2d 26. (Trans. Den.)

The UCC provides the traditional measure of damages for breach of warranty: the value of the goods as warrranted less the value as accepted. § 2-714(2).

The price paid for the goods is competent evidence of their value as warranted. *Bob Anderson Pontiac, Inc.* v. *Davidson, supra.*

The consideration given by buyers totaled $67,716.40; Auto-Teria's evidence showed that the workable goods were resold for approximately $5,500—after another $2,500 to $3,500 was expended to make them saleable. Thus the amount of judgment in favor of the buyers jointly fits comfortably within the boundaries of the evidence. In addition, the UCC allows for the recovery of incidental and foreseeable consequential damages for breach of warranty. §§ 2-714(3), 2-715. Buyers have therefore recovered for lost profits, repairs, and costs of pacifying dissatisfied patrons. *Jerry Alderman Ford Sales, Inc.* v. *Bailey, supra; Rite Fabrics, Inc.* v. *Stafford-Higgins Co., Inc.* (S.D.N.Y. 1973), 366 F. Supp. 1, 13 UCC Rep. Serv. 588.

Suhre testified as to the pain and lost working time attributable to his injury.

Therefore we conclude that the trial court determined the damages in this case in a reasonable manner. § 2-714(1).

We turn now to Auto-Teria's assignment of error relating to the trial court's handling of Auto-Teria's Exhibits D and E.

Exhibit D consisted of two documents. The first was a completion certificate—signed by buyers—which states that the goods were furnished in accordance with the sales agreement and that the goods properly functioned. It was conditional

upon the second document, an attached letter setting forth various items which had not been performed.

Exhibit E was Auto-Teria's written warranty.

Trial counsel for Auto-Teria offered the writings during his case in chief. The trial court "withheld ruling" on them when offered, but sustained buyers' objection to them when trial counsel for Auto-Teria requested a ruling at the end of his case in chief.

Trial counsel for Auto-Teria renewed his offer of the completion certificate after eliciting admissions of its contents and execution from Ahern on cross-examination. The trial court again refused to rule.

When Suhre was cross-examined, the trial court noted that both exhibits were "still under advisement." No one mentioned the exhibits thereafter.

The tenor of the record leads us to conclude that the trial court provisionally excluded the exhibits. This was far from the best course to follow upon the offer of evidence of debatable admissibility in a trial to the court. See McCormick, *Evidence* § 60 (2d Ed. 1972.)

Inasmuch as trial counsel for Auto-Teria re-offered the exhibits and resumed a line of questioning directed toward getting them admitted into evidence, this issue was preserved for our review. See Annot., 88 A.L.R.2d 12 § 19[a] (1963).

This court will reverse a trial court for excluding evidence only where there was an erroneous exclusion of evidence vital to an appellant's case; any valid theory of exclusion will suffice to sustain the trial court's ruling. *American United Life Insurance Co.* v. *Peffley* (1973), 158 Ind. App. 29, 301 N.E.2d 651.

The trial court's exclusion of the completion certificate was within its discretion inasmuch as the contents of the exhibit were put into evidence through the testimony of Ahern. *Killion* v. *Updike* (1974), 161 Ind. App. 577, 316 N.E.2d 837. The admissions by Ahern were primary evidence of the con-

tents of the certificate. *Mark* v. *City of Indianapolis* (1966), 247 Ind. 511, 219 N.E.2d 434.

Inasmuch as Auto-Teria's warranty was not part of the parties' contract, *Zoss* v. *Royal Chevrolet, Inc., supra,* the exhibit tended to prove only non-material facts. Therefore, the trial court committed no error in excluding the warranty, for "only evidence which is pertinent to the issues presented by the case is admissible." *Rust* v. *Watson* (1966), 141 Ind. App. 59, 76, 215 N.E.2d 42.

We conclude that Auto-Teria has shown no error in the trial court's handling of its Exhibits D and E.

ISSUE FIVE:

Auto-Teria finally claims that it was denied a fair trial in that the trial court commenced the trial in a room other than  the regular courtroom where the court reporter was unable to understand and record several questions of counsel and responses from the stand.

The record reveals that this problem was corrected before the first witness' testimony as concluded.[3] The record also discloses no objection was made by Auto-Teria's trial counsel to the bad acoustics which are now claimed to be responsible for the "inaudibles."

Therefore, Auto-Teria will not be heard to complain about the conduct of the trial upon appeal. *Barton* v. *State* (1960), 240 Ind. 257, 163 N.E.2d 600.

This cause is remanded with the instruction to the trial court to make its records reflect the filing of Auto-Teria's "Motion to Correct Errors" on June 4, 1973; and after the record is corrected the trial court's judgment is in all matters affirmed.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 352 N.E.2d 774.

---

3. A review of the transcript discloses that after the correction and until the evidence was concluded very few "inaudibles" were shown in the record.