CHATLOS SYSTEMS, INC., a New Jersey Corporation

v.

NATIONAL CASH REGISTER CORPORATION.

Appeal of NCR CORPORATION.

No. 81–1715.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 1981.

Decided Jan. 15, 1982.

Rehearing Denied Feb. 11, 1982.

Certiorari Dismissed June 9, 1982. See 102 S.Ct. 2918.

---

Richard V. Jones (argued), Stryker, Tams & Dill, Newark, N.J., for appellee; Paul M. Colwell, Newark, N.J., on brief.

Marc S. Friedman (argued), Kalb, Friedman & Siegelbaum, Newark, N.J., for appellant.

Before ALDISERT, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM.

This appeal from a district court's award of damages for breach of warranty in a diversity case tried under New Jersey law presents two questions: whether the district court's computation of damages under N.J.Stat.Ann. § 12A:2–714(2) was clearly erroneous, and whether the district court abused its discretion in supplementing the damage award with pre-judgment interest. We answer both questions in the negative and, therefore, we will affirm.

Plaintiff-appellee Chatlos Systems, Inc., initiated this action in the Superior Court of New Jersey, alleging, *inter alia*, breach of warranty regarding an NCR 399/656 computer system it had acquired from defendant National Cash Register Corp. The case was removed under 28 U.S.C. § 1441(a) to the United States District Court for the District of New Jersey. Following a non-jury trial, the district court determined that defendant was liable for breach of warranty and awarded $57,152.76 damages for breach of warranty and consequential damages in the amount of $63,558.16. *Chatlos Systems, Inc. v. National Cash Register Corp.*, 479 F.Supp. 738 (D.N.J.1979), *aff'd in part, remanded in part*, 635 F.2d 1081 (3d Cir. 1980). Defendant appealed and this court affirmed the district court's findings of liability, set aside the award of consequential damages, and remanded for a recalculation of damages for breach of warranty. *Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir. 1980). On remand, applying the "benefit of the bargain" formula of N.J.Stat.Ann. § 12A:2–714(2) (Uniform Commercial Code § 2–714(2)),[1] the district court determined the damages to be $201,826.50,[2] to which it added an award of pre-judgment interest. Defendant now appeals from these damage determinations, contending that the district court erred in failing to recognize the $46,-

---

1. Section 12A:2–714(2) states:

    The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

2. The district court found the fair market value of the system as warranted to be $207,826.50; from this it subtracted its determination of the value of the goods delivered, $6,000.

020 contract price of the delivered NCR computer system as the fair market value of the goods as warranted, and that the award of damages is without support in the evidence presented. Appellant also contests the award of pre-judgment interest.

Waiving the opportunity to submit additional evidence as to value on the remand which we directed, appellant chose to rely on the record of the original trial and submitted no expert testimony on the market value of a computer which would have performed the functions NCR had warranted. Notwithstanding our previous holding that contract price was not necessarily the same as market value, 635 F.2d at 1088, appellant faults the district judge for rejecting its contention that the contract price for the NCR 399/656 was the only competent record evidence of the value of the system as warranted. The district court relied instead on the testimony of plaintiff-appellee's expert, Dick Brandon, who, without estimating the value of an NCR model 399/656, presented his estimate of the value of a computer system that would perform all of the functions that the NCR 399/656 had been warranted to perform. Brandon did not limit his estimate to equipment of any one manufacturer; he testified regarding manufacturers who could have made systems that would perform the functions that appellant had warranted the NCR 399/656 could perform. He acknowledged that the systems about which he testified

were not in the same price range as the NCR 399/656. Appellant likens this testimony to substituting a Rolls Royce for a Ford, and concludes that the district court's recomputed damage award was therefore clearly contrary to the evidence of fair market value—which in NCR's view is the contract price itself.

■ Appellee did not order, nor was it promised, merely a specific NCR computer model, but an NCR computer system with specified capabilities. The correct measure of damages, under N.J.Stat.Ann. § 12A:2–714(2), is the difference between the fair market value of the goods accepted and the value they would have had if they had been as warranted. Award of that sum is not confined to instances where there has been an increase in value between date of ordering and date of delivery. It may also include the benefit of a contract price which, for whatever reason quoted, was particularly favorable for the customer. Evidence of the contract price may be relevant to the issue of fair market value, but it is not controlling. *Mulvaney v. Tri State Truck & Auto Body, Inc.*, 70 Wis.2d 760, 767, 235 N.W.2d 460, 465 (1975). Appellant limited its fair market value analysis to the contract price of the computer model it actually delivered.[3] Appellee developed evidence of the worth of a computer with the capabilities promised by NCR, and the trial court properly credited the evidence.[4]

---

3. At oral argument, counsel for appellant responded to questions from the bench, as follows:

> Judge Rosenn: Your position also is that you agree, number one, that the fair market value is the measure of damages here.
> Counsel for Appellant: Yes, sir.
> Judge Rosenn: The fair market value you say, in the absence of other evidence to the contrary that is relevant, is the contract price. That is the evidence of fair market value.
> Counsel: That's right.
> Judge Rosenn: Now seeing that had the expert or had the plaintiff been able to establish testimony that there were other machines on the market that were similar to your machine—
> Counsel: Yes.
> Judge Rosenn: That the fair market value of those was $50,000, that would have been

> relevant evidence but it had to be the same machine—same type machine.
> Counsel: Well, I would say that the measure of damages as indicated by the statute requires the same machine—"the goods"—in an operable position.

4. We find the following analogy, rather than the Rolls Royce-Ford analogy submitted by appellant, to be on point:

> Judge Weis: If you start thinking about a piece of equipment that is warranted to lift a thousand pounds and it will only lift 500 pounds, then the cost of something that will lift a thousand pounds gives you more of an idea and that may be—
> Counsel for Appellee: That may be a better analogy, yes.
> Judge Weis: Yes.

■ Appellee was aided, moreover, by the testimony of Frank Hicks, NCR's programmer, who said that he told his company's officials that the "current software was not sufficient in order to deliver the program that the customer [Chatlos] required. They would have to be rewritten or a different system would have to be given to the customer." Appendix to Brief for Appellee at 2.68. Hicks recommended that Chatlos be given an NCR 8200 but was told, "that will not be done." *Id.* at 2.69. Gerald Greenstein, another NCR witness, admitted that the 8200 series was two levels above the 399 in sophistication and price. *Id.* at 14.30. This testimony supported Brandon's statement that the price of the hardware needed to perform Chatlos' requirements would be in the $100,000 to $150,000 range.

Essentially, then, the trial judge was confronted with the conflicting value estimates submitted by the parties. Chatlos' expert's estimates were corroborated to some extent by NCR's supporters. NCR, on the other hand, chose to rely on contract price. Credibility determinations had to be made by the district judge. Although we might have come to a different conclusion on the value of the equipment as warranted had we been sitting as trial judges, we are not free to make our own credibility and factual findings. We may reverse the district court only if its factual determinations were clearly erroneous. *Krasnov v. Dinan*, 465 F.2d 1298 (3d Cir. 1972).[5]

■ Upon reviewing the evidence of record, therefore, we conclude that the computation of damages for breach of warranty was not clearly erroneous. We hold also that the district court acted within its discretion in awarding pre-judgment interest, *Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d at 1088.

5. The dissent essentially is based on disagreement with the estimates provided by Chatlos' expert, Brandon. The record reveals that he was well qualified; the weight to be given his testimony is the responsibility of the factfinder, not an appellate court.

1. Plaintiff's expert, Brandon, testified that generally 40 percent of all computer installations result in failures. He further testified that successful installations of computer systems re-

The judgment of the district court will be affirmed.

ROSENN, Circuit Judge, dissenting.

The primary question in this appeal involves the application of Article 2 of the Uniform Commercial Code as adopted by New Jersey in N.J.S.A. 12A:2–101 et seq. (1962) to the measure of damages for breach of warranty in the sale of a computer system. I respectfully dissent because I believe there is no probative evidence to support the district court's award of damages for the breach of warranty in a sum amounting to almost five times the purchase price of the goods. The measure of damages also has been misapplied and this could have a significant effect in the marketplace, especially for the unique and burgeoning computer industry.[1]

In July 1974, National Cash Register Corporation (NCR) sold Chatlos Systems, Inc. (Chatlos), a NCR 399/656 disc computer system (NCR 399) for $46,020 (exclusive of 5 percent sales tax of $1,987.50). The price and system included:

| | |
|---|---|
| The computer (hardware) ........ | $40,165.00 |
| Software (consisting of 6 computer programs)[2] ................ | 5,855.00 |
| | $46,020.00 |

NCR delivered the disc computer to Chatlos in December 1974 and in March 1975 the payroll program became operational. By March of the following year, however, NCR was still unsuccessful in installing an operational order entry program and inventory deletion program. Moreover, on August 31, 1976, Chatlos experienced problems with the payroll program. On that same day and the day following NCR installed an

quire not only the computer companies' attention but also the attention of the customers' top management.

2. The six basic computer programs were: (1) accounts receivable, (2) payroll, (3) order entry, (4) inventory deletion, (5) state income tax, and (6) cash receipts. The contract price also included installation.

operational state income tax program, but on September 1, 1976, Chatlos demanded termination of the lease[3] and removal of the computer.

When this case was previously before us, we upheld the district court's liability decision but remanded for a reassessment of damages, instructing the court that under the purchase contract and the law consequential damages could not be awarded. Consequential damages, therefore, are no longer an issue here.[4]

On remand, the district court, on the basis of the previous record made in the case, fixed the fair market value of the NCR 399 as warranted at the time of its acceptance in August 1975 at $207,826.50. It reached that figure by valuing the hardware at $131,250.00 and the software at $76,575.50, for a total of $207,826.50. The court then determined that the present value of the computer hardware, which Chatlos retained, was $6,000. Putting no value on the accepted payroll program, the court deducted the $6,000 and arrived at an award of $201,826.50 plus pre-judgment interest at the rate of 8 percent per annum from August 1975.

Chatlos contends before this court, as it had before the district court on remand, that under its benefit of the bargain theory the fair market value of the goods as warranted was several times the purchase price of $46,020. As the purchaser, Chatlos had the burden of proving the extent of the loss. *Council Brothers, Inc. v. Ray Burner Co.*, 473 F.2d 400, 408 (5th Cir. 1973). In remanding to the district court for a reassessment of the damages, we did not reject the contract price for the goods sold as the

proper valuation of the computer as warranted. We merely corrected the district court's misconception that the language of the New Jersey statute precluded consideration of fair market value. We held that "value" in section 2–714(2) must mean fair market value at the time and place of acceptance.[5] We pointed out:

> It may be assumed that in many cases fair market value and contract price are the same, and therefore, if a party wishes to show a difference between the two he should produce evidence to that effect.

*Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081, 1088 (3d Cir. 1980) (emphasis added) *on remand*, No. 77–2548 (D.N.J., filed Mar. 12, 1981). Thus, the sole issue before us now is whether the district court erred in fixing the fair market value of the computer system as warranted at the time of the acceptance in August 1975 at $207,826.50.

## II.

### A.

I believe that the district court committed legal error. The majority conclude that the standard of review of the district court's determination of the fair market value of the goods for the purpose of awarding damages is whether the trial judge's determination of market value is clearly erroneous. I disagree. Had the court merely miscalculated the amount of damages, I might agree with the majority's standard, for then our concern would be with basic facts. Here, however, no evidence was introduced as to the market value of the specific goods purchased and accepted had the system conformed to the

---

3. Chatlos decided to lease the system rather than purchase it outright. To permit this arrangement, NCR sold the system to Mid Atlantic National Bank in July 1975 for $46,020, which leased the system to Chatlos. Chatlos made monthly payments to Mid Atlantic in amounts which would have totaled $70,162.09 over the period of the lease.

4. Besides rejecting the district court's award of consequential damages, this court on the previous appeal disagreed with the district court's starting point of $70,162.22, the amount Chat-

los obligated itself to pay the bank, for two reasons: (1) the price Chatlos paid the bank included the bank's finance charges which should have been excluded, and (2) the district court erred in refusing to consider Chatlos' evidence of fair market value, which is the starting point for determining damages under section 2–714(2).

5. August 1975 represents the acceptance date. It is the date the finance company paid NCR and leased the computer system to Chatlos.

warranty. Thus, the matter before us is one of legal error, and our standard of review is plenary. But even under the standard applied by the majority, the district court should be reversed because its determination of market value is not supported by probative evidence.

There are a number of major flaws in the plaintiff's attempt to prove damages in excess of the contract price. I commence with an analysis of plaintiff's basic theory. Chatlos presented its case under a theory that although, as a sophisticated purchaser, it bargained for several months before arriving at a decision on the computer system it required and the price of $46,020, it is entitled, because of the breach of warranty, to damages predicated on a considerably more expensive system. Stated another way, even if it bargained for a cheap system, *i.e.*, one whose low cost reflects its inferior quality, because that system did not perform as bargained for, it is now entitled to damages measured by the value of a system which, although capable of performing the identical functions as the NCR 399, is of far superior quality and accordingly more expensive.

The statutory measure of damages for breach of warranty specifically provides that the measure is the difference at the time and place of acceptance between the value "of the goods accepted" and the "value they would have had if they had been as warranted."[6] The focus of the statute is upon "the goods accepted"—not other hypothetical goods which may perform equivalent functions. "Moreover, the value to be considered is the reasonable market value of the *goods delivered*, not the value of the goods to a particular purchaser or for a

particular purpose." *KLPR–TV, Inc. v. Visual Electronics Corp.*, 465 F.2d 1382, 1387 (8th Cir. 1972) (emphasis added). The court, however, arrived at value on the basis of a hypothetical construction of a system as of December 1978 by the plaintiff's expert, Brandon. The court reached its value by working backward from Brandon's figures, adjusting for inflation.

In presenting its case Chatlos developed its expert testimony as though it were seeking "cover" damages—the cost for the replacement of the computer system under section 2–712 of the statute. First, "cover" damages are obviously inappropriate here because both the district court and this court in its earlier decision held that the measure of damages is governed by section 2–714(2).[7] Furthermore, Chatlos did not "cover" in this case and, although there was testimony that it would use an IBM Series 1 mini-computer to perform the NCR 399 functions, the president of Chatlos personally testified that the IBM "wasn't purchased with intent to replace the 399 system at the time of purchase." Second, Chatlos gave no evidence as to the cost of the IBM Series 1 computer system. However, under the applicable section of the statute, 2–714, the measure of damages is specifically confined to "the difference between the value of the *goods accepted* and the value they would have had if they had been as warranted" and does not include "the difference between the cost of *cover* and the contract price" as provided by section 2–712.

Although NCR warranted performance, the failure of its equipment to perform, absent any evidence of the value of any NCR 399 system on which to base fair market value,[8] does not permit a market value

---

**6.** The measure of damages is not an issue. Since Chatlos accepted the computer system, the measure of damages is set out in N.J.S.A. 12A:2–714 "Buyer's Damages for Breach in Regard to Accepted Goods." The relevant subsection is:

(2) The measure of damages for breach of warranty is the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances

show proximate damages of a different amount.

*Id.*

**7.** "Cover" damages are not available for goods purchased except under the provisions of N.J. S.A. 12A:2–711 and 712 (1962).

**8.** There is evidence that the NCR 399 model had been installed at a number of customer sites prior to the Chatlos installation. *See* plaintiff's Exhibit No. 25.

based on systems wholly unrelated to the goods sold. Yet, instead of addressing the fair market value of the NCR 399 had it been as warranted, Brandon addressed the fair market value of another system that he concocted by drawing on elements from other major computer systems manufactured by companies such as IBM, Burroughs, and Honeywell, which he considered would perform "functions identical to those contracted for" by Chatlos. He conceded that the systems were "[p]erhaps not within the same range of dollars that the bargain was involved with" and he did not identify specific packages· of software. Brandon had no difficulty in arriving at the fair market value of the inoperable NCR equipment but instead of fixing a value on the system had it been operable attempted to fashion a hypothetical system on which he placed a value. The district court, in turn, erroneously adopted that value as the fair market value for an operable NCR 399 system. NCR rightly contends that the "comparable" systems on which Brandon drew were substitute goods of greater technological power and capability and not acceptable in determining damages for breach of warranty under section 2–714. Furthermore, Brandon's hypothetical system did not exist and its valuation was largely speculation.

### B.

A review of Brandon's testimony reveals its legal inadequacy for establishing the market value of the system Chatlos purchased from NCR. Brandon never testified to the fair market value which the NCR 399 system would have had had it met the warranty at the time of acceptance. He was not even asked the question. His testimony with respect to the programming or software[9] was developed along the following line:

Q: Mr. Brandon, based upon your knowledge and experience in the field, are you aware of any other vendors in the computer industry who would have been able to supply a system, that is, hardware and software, which would provide the functions that were contemplated by the arrangement between NCR and Chatlos Systems.

\* \* \* \* \* \*

A: Yes, there are a number of other vendors who would have made or ·could have made comparable systems available whose functions would be identical to those desired by Chatlos or required by Chatlos.

\* \* \* \* \* \*

Q: What, if you know, would have been the price of acquiring that similar system in September of 1976?

\* \* \* \* \* \*

A: I made some estimates of cost of acquiring seven separate application components, the seven to which I have earlier testified. I made those estimates in December, 1978, at which time I estimated the cost to be approximately, in the aggregate, approximately $102,000.

His estimate of the cost of the hardware in 1976 was "in the range of $100,000 to $150,000."

Not only did Brandon not testify in terms of the value of the NCR 399, but he spoke vaguely of "a general estimate . . . as to what the cost might be of, let's say, developing a payroll or purchasing a payroll package today and installing it at Chatlos." He explained that what he would do, without identifying specific packages, would be to obtain price lists "from the foremost organizations selling packages in our field, in that area," organizations such as Management Science of America in Atlanta, and take their prices for specific packages. When asked what packages he would use for this system, he replied, "I would shop around, frankly." Speculating, he testified, "I think that I would go to two or three

---

**9.** By working backwards and factoring 15 to 20 percent for inflation, Brandon attempted to fix a value on the software as of September 1976. But under the statute, the valuation date is the "time of acceptance" and it is undisputed that took place over a year earlier—August 1975. The court adjusted for inflation back to August 1975.

alternatives in terms of obtaining packages."[10] When asked to address himself to the packages that he would provide for this system, he acknowledged that the programs he had in mind were only available "[for] certain types of machines." For example, he conceded that these programs would not be available for the Series 1 IBM mini-computer, "with the possible exception of payroll."

Thus, the shortcomings in Brandon's testimony defy common sense and the realities of the marketplace. First, ordinarily, the best evidence of fair market value is what a willing purchaser would pay in cash to a willing seller. *Vollmer v. City of Philadelphia*, 350 Pa. 223, 38 A.2d 266, 269 (1944) (quoting *Hudson Coal Company's Appeal*, 327 Pa. 247, 251, 193 A. 8, 10 (1937)); *Yara Engineering Corp. v. City of Newark*, 136 N.J.Eq. 453, 42 A.2d 632, 638 (N.J. Ch. 1945). In the instant case we have clearly "not ... an unsophisticated consumer," *Chatlos Systems v. National Cash Register Corp.*, 479 F.Supp. 738, 748 (D.N.J.1979), *modified*, 635 F.2d 1081 (3rd Cir. 1980), *on remand*, No. 77–2548 (D.N.J., filed Mar. 12, 1981), who for a considerable period of time negotiated and bargained with an experienced designer and vendor of computer systems. The price they agreed upon for an operable system would ordinarily be the best evidence of its value. The testimony does not present us with the situation referred to in our previous decision, where "the value of the goods rises between the time that the contract is executed and the time of acceptance," in which event the buyer is entitled to the benefit of his bargain. *Chatlos, supra*, 635 F.2d at 1088. On the contrary, Chatlos here relies on an expert who has indulged in the widest kind of speculation. Based on this testimony, Chatlos asserts in effect that a multi-national sophisticated vendor of computer equipment, despite months of negotiation, incredibly agreed to sell an operable computer system for $46,020 when, in fact, it had a fair market value of $207,000.

Second, expert opinion may, of course, be utilized to prove market value but it must be reasonably grounded. Brandon did not testify to the fair market value "of the *goods* accepted" had they met the warranty. Instead, he testified about a hypothetical system that he mentally fashioned. He ignored the realistic cost advantage in purchasing a unified system as contrasted with the "cost of acquiring seven separate application components" from various vendors.

Third, in arriving at his figure of $102,000 for the software, Brandon improperly included the time and cost of training the customer's personnel associated with the installation of the system. In a deposition prior to trial, Brandon testified that his valuation of the software included the time necessary to train Chatlos' personnel in the use of the system. On direct examination at trial, he testified that the $102,000 value fixed for software and programming did

---

10. The speculative nature of his estimate is revealed by his reply on cross-examination:

> Q: Now, your estimate of $103,000 was based on the use of what packages, payroll, accounts receivable, order entry, inventory control, etcetera; what packages did you include in your estimate of $102,000?
> A. I assumed that we would be able to obtain through competitive bidding packages from vendors in the computer field to meet most of these requirements, if not all of those requirements, and that to the extent that we could not meet the Chatlos requirements they could be modified by a programmer to meet those requirements.
> Q. Do you know or did you make an estimate of the purchase price for the various programs that you have told us about, packages?
> A. I only made estimates, sir, because no decision as to machine is available, therefore, it is impossible to go out and shop for specific packages.
> Q. Does the cost of a package depend on the machine?
> A. In part.
> Q. You estimated a cost of $102,000 but you don't know how much the packages cost; is that right?
> A. Well, I did obtain some estimates of packages from, as I mentioned the foremost package sales organization in the country, just so that I would have a basis for making sure that my numbers were not unreasonable.

*not* include the time and cost necessary to train Chatlos' personnel in the use of the system, indicating that the cost of training a customer and his personnel is "definitely" not included in the price of programming and software. When confronted with his prior inconsistent deposition, he conceded that in his estimate of $102,000 "we included the Chatlos time."

Fourth, the record contains testimony which appears undisputed that computer equipment falls into one of several tiers, depending upon the degree of sophistication. The more sophisticated equipment has the capability of performing the functions of the least sophisticated equipment, but the less sophisticated equipment cannot perform all of the functions of those in higher levels. The price of the more technologically advanced equipment is obviously greater.

It is undisputed that in September 1976 there were vendors of computer equipment of the same general size as the NCR 399/656 with disc in the price range of $35,000 to $40,000 capable of providing the same programs as those required by Chatlos, including IBM, Phillips, and Burroughs. They were the very companies who competed for the sale of the computer in 1974 in the same price range. On the other hand, Chatlos' requirements could also be satisfied by computers available at "three levels higher in price and sophistication than the 399 disc." Each level higher would mean more sophistication, greater capabilities, and more memory. Greenstein, NCR's expert, testified without contradiction that equipment of Burroughs, IBM, and other vendors in the price range of $100,000 to $150,000, capable of performing Chatlos' requirements, was not comparable to the 399 because it was three levels higher. Such equipment was more comparable to the NCR 8400 series.[11]

Fifth, when it came to the valuation of the hardware, Brandon did not offer an opinion as to the market value of the hypothetical system he was proposing. Instead, he offered a wide ranging estimate of $100,000 to $150,000 for a hypothetical computer that would meet Chatlos' programming requirements. The range in itself suggests the speculation in which he indulged.

### III.

The purpose of the N.J.S.A. 12A:2–714 is to put the buyer in the same position he would have been in if there had been no breach. *See* Uniform Commercial Code 1–106(1). The remedies for a breach of warranty were intended to compensate the buyer for his loss; they were not intended to give the purchaser a windfall or treasure trove. The buyer may not receive more than it bargained for; it may not obtain the value of a superior computer system which it did not purchase even though such a system can perform all of the functions the inferior system was designed to serve. Thus, in *Meyers v. Antone*, 227 A.2d 56 (D.C.App.1967), the court held that where the buyers contracted for a properly functioning used oil heating system which proved defective, they were free to substitute a gas system (which they did), change over to forced air heating, or even experiment with a solar heating plant. "They could not, however, recover the cost of such systems. They contracted for a used oil system that would function properly, and can neither receive more than they bargained for nor be put in a better position than they would have been had the contract been fully performed. *Id.* at 59 (citations omitted).

This court, in directing consideration of fair market value as the starting point in deciding damages noted Chatlos' contention that exclusive use of contract price deprives the dissatisfied buyer of the "benefit of his bargain." We accepted the concept of "benefit of the bargain" and explicated our understanding of the concept as follows:

---

11. Greenstein testified that NCR had two higher levels of computer equipment between its 399/656 model and the NCR 8400 series.

If the value of the goods rises between the time the contract is executed and the time of acceptance, the buyer should not lose the advantage of a favorable contract price because of the seller's breach of warranty. Conversely, if the value drops, the seller is entitled to the resulting lower computation.

*Chatlos, supra*, 635 F.2d at 1088. Ironically, this example of benefit of the bargain is actually based on contract price. If on the date of acceptance the fair market value of the goods has risen or declined from the contract price, that variation must be taken into account in awarding damages. But here plaintiff's market value figures, accepted by the district court on remand, have no connection whatsoever with the contract price.

Although it may be that the "benefit of the bargain" concept is applicable to situations involving other than periodic fluctuations in market prices, the cases cited by Chatlos stand only for the premise that the proved market value of the goods in question must be accepted. Thus, in *Melody Home Manufacturing Co. v. Morrison*, 502 S.W.2d 196 (Tex.Civ.App.1973), where $5,300 was the price of a mobile home, the measure of damages for breach of warranty under U.C.C. § 2–714(2) was the difference between $2,000, the value of the delivered home, and $6,000 the proved market value of the particular home. In *Miles v. Lyons*, 42 Mass.App.Dec. 77, 6 U.C.C.Rep. 659 (Dist. Ct.1969), the defendants (Lyons) sued for conversion of furniture, impleaded Anita Miles, former wife of the plaintiff, from whom they had purchased the furniture. Mrs. Miles had sold it to the Lyons for $100, falsely asserting it belonged to her. The justice found for the plaintiff in the amount of $275, the value of the furniture at the time of conversion, but he found for the Lyons as third-party plaintiffs for $100. On appeal, the finding of $100 was vacated and judgment entered for $275, the loss resulting from the seller's breach of warranty of title. The Lyons were entitled, the court held, to the benefit of their bargain and the measure of damages under section 2–714. The bargain consisted of the value of the specific furniture they purchased— not other hypothetical furniture constructed in superior fashion or of superior materials.

Even if we were to accept plaintiff's theory that the value of other systems may be used to establish the value of the specific computer system purchased, the cases cited by Chatlos to support its theory are distinguishable. In *Giant Food v. Jack I. Bender & Sons*, 399 A.2d 1293 (D.C.App.1979), when a seller, after three years, replaced carpet under warranty with new carpet of higher price, the buyer refused to pay the excess cost. The court agreed that the value of the replacement carpet represented the buyer's damages. However, the appellate court expressly noted that "[t]he trial court implicitly found that the *replacement* was a reasonable one—*i.e.*, it was of substantially the same style, goods and character as that for which [the buyer] had originally contracted." *Id.* at 1306 n.26 (emphasis added). In the instant case, there was no testimony that the hypothetical system—apart from its ability to perform identical functions— was otherwise the same. Furthermore, as distinguished from this case, the goods were *actually replaced* by the seller. In *Huyett-Smith Manufacturing Co. v. Gray*, 129 N.C. 438, 40 S.E. 178 (1901), a pre-Code case, the vendor of a kiln represented that it had a capacity in excess of any kiln on the market. In measuring the damages claimed by the purchaser the court would not fix damages in excess of the contract by looking to a non-existent kiln stating that the purchaser "is not entitled to speculative damages for an ideal machine which was not on the market." *Id.* at 179.

Because Brandon's testimony does not support Chatlos' grossly extravagant claim of the fair market value of the NCR 399 at the time of its acceptance, the only evidence of the market value at the time is the price negotiated by the parties for the NCR computer system as warranted.

There are many cases in which the goods will be irreparable or not replaceable and therefore the costs of repair or replacement can not serve as a yardstick

of the buyer's damages.... When fair market value cannot be easily determined ... the purchase price may turn out to be strong evidence of the value of the goods as warranted.

J. White & R. Summers, Uniform Commercial Code § 10–2, at 380 (2d ed. 1980) (footnotes omitted).[12] *Accord Auto-Teria, Inc. v. Ahern*, 170 Ind.App. 84, 352 N.E.2d 774, 783 (1976). In *Long v. Quality Mobile Home Brokers, Inc.*, 271 S.C. 482, 248 S.E.2d 311 (1978), the court applied section 2–714(2) of the U.C.C. to arrive at a measure of damages for breach of warranty. Noting that "value" as used in that section meant "fair market value," it asserted that "the cash price paid for goods is prima facie the value of the goods as warranted." *Id.* 248 S.E.2d at 312. *White & Summers, supra*, at 382, also remind us that "the value of goods *as warranted* will seldom be in dispute, for the contract price will be a powerful measure of that end of the formula." (Emphasis added; footnote omitted.)

Thus, where there is no proof that market value of the goods differs from the contract price, the contract price will govern, *cf. Gulf Chemical & Metallurgical Corp. v. Sylvan Chemical Corp.*, 122 N.J.Super. 499, 505, 300 A.2d 878, 882 (Law Div.), *aff'd*, 126 N.J.Super. 261, 314 A.2d 73 (App.Div. 1973), *certification denied*, 64 N.J. 507, 317 A.2d 720 (1974) (party not entitled under N.J.S.A. 12A:2–713(1) to damages based on the benefit of his bargain, *i.e.*, the difference between the contract price and the market price when "there is no proof ... that the market price for the goods purchased was any different than the price contracted for ...."), and in this case that amounts to $46,020. Chatlos has retained the system hardware and the district court fixed its present value in the open market

at $6,000. The court properly deducted this sum from the damages awarded.

## IV.

Chatlos purchased the NCR payroll program and acknowledged at trial that the program operated fully and satisfactorily beginning February or March 1975 until October 1978 when it discontinued its use. The district court assigned no value to it because there was no evidence of fair market value. However, the law is clear that without evidence of a value other than contract price, that price should be accepted as the fair market value of the payroll program. The parties agreed on a contract price of $1,000 and that sum should be deducted from the measure of damages.

## V.

NCR complains that the award of prejudgment interest is impermissible under New Jersey law. On remand, the district court awarded prejudgment interest from August 1975 but offered no explanation for so doing. Congress has not provided for prejudgment interest but has provided that interest on a money judgment recovered in a district court in a civil case shall be allowed and "shall be calculated from the date of the entry of the judgment, at the rate allowed by State law." 28 U.S.C.A. § 1961 (1959). *See also* Fed.R.App.P. 37.

In *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715 (3d Cir. 1971), the plaintiff also claimed that it was entitled to prejudgment interest under New Jersey law for a breach of contract. In writing for this court, Chief Judge Seitz stated:

Under New Jersey law, a successful plaintiff in an action for breach of contract is not entitled to prejudgment inter-

---

**12.** In *Soo Line R. R. Co. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977), the court of appeals approved the following jury instruction on the measure of damages for breach of warranty in the manufacture of railcars:

"However, if you find that the repair of the cars did not restore them to substantially the same condition as they would have been if properly manufactured, then the difference or diminution in value is the reasonable cost

of repair, plus the difference between the fair market value of the ... cars if they had been manufactured without faults or defects, and the fair market value of the repairs.

The total figure, however, cannot exceed the difference between the fair market value as accepted, and the fair market value in the defective condition you find."

*Id.* at 1378.

est as a matter of right where damages are unliquidated. Indeed, the rule appears to be that, unless considerations of justice and fair dealing clearly demand a different result, "interest should not be allowed where the damages are unliquidated and not capable of ascertainment by mere computation, or where a serious and substantial controversy exists as to the amount due under a contract." *Jardine Estates, Inc. v. Donna Brook Corp.,* 42 N.J.Super. 332, 341, 126 A.2d 372, 377 (App.Div.1956); . . .

*Id.* at 723. This case too involves a breach of contract and unliquidated damages. In light of its history and the nature of the very appeal, there can be no doubt that a substantial controversy existed over liability and damages. The trial judge made no finding that considerations of justice and fair dealing demanded an award of prejudgment interest. On the contrary, the judge found that plaintiff had not proved fraud on NCR's part and found that it had acted fairly and in good faith with Chatlos during the entire course of their dealings. When we previously considered the issue of liability, we concluded "[n]o evidence of wrongful intent on the part of NCR was found, nor did the plaintiff prove fraudulent misrepresentation." *Chatlos supra,* 635 F.2d at 1084. We also stated:

> [I]t is worth mentioning that even though unsuccessful in correcting the problems within an appropriate time, NCR continued in its efforts. Indeed, on the date of termination NCR was still actively working on the system at the Chatlos plant. In fact, the trial court thought that Chatlos should have cooperated further by accepting the installation of the programs. This is not a case where the seller acted unreasonably or in bad faith.

*Id.* at 1087 (footnote omitted).

I have examined the cases cited by Chatlos in support of the award and find them inapposite. Thus, I conclude that under New Jersey law Chatlos is not entitled to prejudgment interest.

## VI.

On this record, therefore, the damages to which plaintiff is entitled are $46,020 less $6,000, the fair market value at time of trial of the retained hardware, and less $1,000, the fair market value of the payroll program, or the net sum of $39,020.

Accordingly, I would reverse the judgment of the district court and direct it to enter judgment for the plaintiff in the sum of $39,020 with interest from the date of entry of the initial judgment at the rate allowed by state law.

## SUR PETITION FOR REHEARING

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER and ROSENN, Circuit Judges.*

The petition for rehearing filed by appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judges Adams, Hunter and Garth would grant the petition for rehearing.

ADAMS, Circuit Judge, dissents from the denial of rehearing, and makes the following statement:

> Ordinarily, an interpretation of state law by this Court, sitting in diversity, is not of sufficient consequence to warrant reconsideration by the Court sitting in banc. One reason is that if a federal court misconstrues the law of a state, the courts of that state have an opportunity, at some point, to reject the federal court's interpretation. *See Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1286–87 (3d Cir. 1979) (in banc) (Aldisert, J., dissenting). In this case, however, the majority's holding, which

---

\* Judge Gibbons did not participate in the consideration of this matter.

endorses a measure of damages that is based on what appears to be a new interpretation of New Jersey's commercial law, involves a construction of the Uniform Commercial Code as well. Rectification of any error in our interpretation is, because of the national application of the Uniform Commercial Code, significantly more difficult than it would be if New Jersey law alone were implicated. Moreover, the provision of the Uniform Commercial Code involved here is of unusual importance: the measure of damages approved by this Court may create large monetary risks and obligations in a wide range of commercial transactions, including specifically the present burgeoning computer industry. Because there would appear to be considerable force to the dissenting opinion of Judge Rosenn and because I believe that the principle articulated by the majority should be reviewed by the entire Court before it is finally adopted, I would grant the petition for rehearing in banc.

JAMES HUNTER, III and GARTH, Circuit Judges join in this statement.

BY THE COURT,
RUGGERO J. ALDISERT
*Circuit Judge*