CHATLOS SYSTEMS, INC., a New Jersey Corporation

v.

NATIONAL CASH REGISTER CORPORATION (NCR CORPORATION).

Appeal of CHATLOS SYSTEMS, INC., in No. 80–1011.

Appeal of NCR CORPORATION, INC., in No. 80–1012.

Nos. 80–1011, 80–1012.

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 1980.

Decided Nov. 26, 1980.

As Amended Dec. 5, 1980.

Marc S. Friedman (argued), Steven D. Fleissig, Kalb, Friedman & Siegelbaum, Newark, N.J., for Chatlos Systems, Inc.

Richard V. Jones (argued), Paul M. Colwell, Stryker, Tams & Dill, Newark, N.J., for National Cash Register Corp.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this diversity case governed by the Uniform Commercial Code, the district court assessed damages for breach of warranty after finding that the seller's failure to timely program a computer system caused a contractual remedy to fail of its essential purpose. Despite an express provision in the agreement prohibiting recovery of consequential damages, the court also made an award for such losses. Although we accept the determination on the failure of the contractual remedy, we do not agree that the disclaimer of consequential damages is ineffective as a result. We conclude that that clause must be evaluated on its own merits and, in this case, enforced. In addition, we are unable to accept certain trial court determinations on the factors used to compute the other items of damage, and we remand for recalculation.

### I

Chatlos Systems, Inc. (Chatlos), filed suit in the New Jersey Superior Court against National Cash Register Corp. (NCR), alleging, *inter alia*, breach of warranty in connection with the sale of a computer system. The case was removed to the United States District Court for the District of New Jersey, and after a bench trial, judgment was entered in favor of the plaintiff for $120,710.92.[1]

Chatlos designs and manufactures cable pressurization equipment for the telecommunications industry. In the spring of 1974, the company decided to purchase a computer system and contacted several manufacturers, among them NCR. That firm suggested a magnetic ledger card system, but, after further inquiry by Chatlos, agreed to provide the 399/656 disc system, a computer utilizing more advanced technology, as the appropriate model for the customer's need.

This system was designed to provide six functions for Chatlos: (1) accounts receivable, (2) payroll, (3) order entry, (4) inventory deletion, (5) state income tax, (6) cash receipts. NCR represented to Chatlos that the system would solve inventory problems, result in direct savings of labor costs, and be programmed by capable NCR personnel to be "up and running" (in full operation) within six months.

On July 24, 1974 Chatlos signed a system service agreement with NCR as part of the transaction, and the computer hardware was delivered the following December. Because NCR would not extend credit, Chatlos made a leasing arrangement with Midlantic National Bank, agreeing to pay $70,162.09 on a monthly installment basis. This is a common practice in the trade; the computer company sells the system to a bank, which in turn leases it to the customer.

Chatlos understood that the system would be operational about three months after delivery and therefore expected it to be "up and running" by March 1975. An NCR employee began programming in January 1975, but by March, only one of the functions, payroll, was in operation. Efforts to install the inventory deletion and order entry programs were unsuccessful. These functions used multiple records per sector technology · the storing of several items of information in one section of a disc. But the NCR programmer was unable to delete any information within the same section without erasing it all. Since Chatlos had

---

1. The opinion is reported at 479 F.Supp. 738 (D.N.J.1979).

purchased the computer to record its extensive parts inventory, the inability to solve the multiple records sector problem posed a major difficulty—the withdrawal of one part in a unit erroneously deleted the entire unit.

One year later the problem persisted. NCR analysts attempted a demonstration of the order entry and accounts receivable functions in March 1976, but significant problems surfaced with both. In June 1976 Chatlos asked that the lease be cancelled and the computer removed, but, at NCR's request, agreed to allow additional time to make the system operational. On August 31, 1976 Chatlos experienced problems with the payroll function, the only operation the computer had been performing properly.

On September 1, 1976 the state income tax program was installed. The next day an NCR representative arrived at the Chatlos plant to install the order entry program. Chatlos refused to allow the work to proceed and again asked NCR to terminate the lease and remove the computer. NCR refused, stating that it had no ownership rights in the system, having been paid by the bank.

The district judge, applying New Jersey law, reasoned that despite the service aspects and lease arrangement, the transaction was for the sale of goods within the meaning of Article 2 of the Uniform Commercial Code. N.J.Stat.Ann. §§ 12A:2–101 to 12A:2–725 (West 1962 & Cum. Supp. 1980). He determined that certain express warranties had been made in various writings executed by the parties.

The court found that NCR had warranted its product for "12 months after delivery against defects in material, workmanship and operational failure from ordinary use," and further that "services [would be] performed in a skillful and workmanlike manner." In addition, there was an oral, express warranty, memorialized in a purchase order prepared by the Midlantic Bank, providing that "since the goods . . . are purchased by us expressly for the use of [Chatlos], [NCR] further warrants that the goods are in good working order, fit for the use

[Chatlos] intends them, and fulfill all representations made by [NCR] to [Chatlos]." 479 F.Supp. at 743. The purchase order also provided that Chatlos was "to obtain all the benefits of all warranties." Finally, the court held that since Chatlos's reliance upon the skill and judgment of NCR was known to it, an implied warranty of fitness for Chatlos's particular purposes was created as well. Id.; see N.J.Stat.Ann. § 12A:2–315 (West 1962).

Finding that these warranties had been breached, the court looked to U.C.C. § 2–714(2). That section measures damages for breach of warranty as the difference between the value of what was accepted and what was warranted, N.J.Stat.Ann. § 12A:2–714(2), which in this case was determined to be $57,152.76. The court awarded additional damages of $63,558.16 for items such as employee salaries and lost profits, since it concluded that NCR's disclaimer of consequential damages was ineffective.

No evidence of wrongful intent on the part of NCR was found, nor did the plaintiff prove fraudulent misrepresentation. Consequently, a claim for punitive damages was denied.

## II

Both parties have appealed, and while they concede the applicability of the U.C.C., each contests liability and damage determinations. We have examined the contentions of the parties with respect to the court's conclusions on warranties, their breach, lack of fraud, and punitive damages. The district court's findings and reasoning on these aspects of the case are not erroneous and will be affirmed.

## III

We are unable to concur, however, with the trial court's computation of damages. Accepting the finding that NCR breached its warranties, our next step is to examine the contract and determine whether the parties limited otherwise applicable remedies. U.C.C. § 2–719(1) provides that the

parties may so agree. N.J.Stat.Ann. § 12A:2–719(1) (West 1962).

The contract states that services would be performed in a skillful and professional manner, and further provides that NCR's obligation was limited to correcting any "error in any program or routine as appears within 60 days after such has been furnished." Another part of the contract reads: "In no event shall NCR be liable for special or consequential damages from any cause whatsoever." We will discuss these two restrictions separately.

■ Before a limitation on a party's remedies may be enforced, it must be established that the contract contains "an exclusive or limited remedy." *Id.* § 12A:2–719(1)(b). The agreement here does say that NCR's obligation is "limited." Although an argument might be made that this is not clearly expressed, we will assume *arguendo* that the contract satisfies this Code requirement.

An exclusive or limited remedy, however, must be viewed against the background of U.C.C. § 2–719(2), which provides, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." N.J.Stat.Ann. § 12A:2–719(2) (West 1962).

This section requires analysis of the applicable remedy so as to determine its essential purpose and whether it has failed of that purpose. Several goals of the limited remedy of repair may be envisioned, but its primary objective is to give the seller an opportunity to make the goods conform while limiting exposure to risk by excluding liability for damages that might otherwise be due. *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973). Viewed from the buyer's standpoint, the repair remedy's aim is to provide goods that conform to the contract for sale and do so at an appropriate time. A delay in supplying the remedy can just as effectively deny the purchaser the product he expected as can the total inability to repair. In both instances the buyer loses the substantial benefit of his purchase.

■ To be effective the repair remedy must be provided within a reasonable time after discovery of the defect. *Id.*[2] It is not necessary to show negligence or bad faith on the part of the seller, *S. M. Wilson & Co. v. Smith International, Inc.*, 587 F.2d 1363, 1374–75 (9th Cir. 1978). The detriment to the buyer is the same whether the seller diligently but unsuccessfully attempts to honor his promise or acts negligently or in bad faith.

■ When presented with the question whether an exclusive repair remedy fails of its essential purpose, courts generally have concluded that so long as the buyer has the use of substantially defect–free goods, the limited remedy should be given effect. But when the seller is either unwilling or unable to conform the goods to the contract, the remedy does not suffice. For example, in *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir. 1971), the purchaser of an automobile sued the manufacture for damages caused by its inability to correct defects in the car. The court of appeals rejected the defendant's attempt to rely upon a repair or replacement of defective parts clause in the purchase agreement and concluded that the jury could find "that the warranty operated to deprive the purchaser 'of the substantial value of the bargain.'" *Id.* at 673, *quoting* U.C.C. § 2–719, Official Comment 1. With respect to the defendant's delay, the court noted that "the seller does not have an unlimited time for the performance of the obligation to replace and repair parts." *Id.* n.5.

In this case we consider a product programmed specifically to meet the customer's individual needs. Time was of substantial importance. Chatlos realized that the increasing scale of its operations required computerization and undertook the investment in 1974 because added efficiency was needed at that time. NCR represented to

---

**2..** U.C.C. § 2–309(1) provides: "The time for shipment or delivery *or any other action under a contract* if not provided in this Chapter or agreed upon shall be a reasonable time." N.J. Stat.Ann. § 12A:2–309(1) (West 1962) (emphasis supplied).

Chatlos that a six–function system would be up and running by March 1975. Yet, more than a year later, only one of the functions was in operation, and by September 1976, less than half of the desired capability of the system was available to Chatlos.

■ NCR repeatedly attempted to correct the deficiencies in the system, but nevertheless still had not provided the product warranted a year and a half after Chatlos had reasonably expected a fully operational computer. In these circumstances, the delay made the correction remedy ineffective, and it therefore failed of its essential purpose. Consequently, the contractual limitation was unenforceable and did not preclude recovery of damages for the breach of warranty.

This conclusion, however, does not dispose of the contractual clause excluding consequential damages. U.C.C. § 2–719(2) states that when an exclusive or limited remedy fails of its purpose, remedy may be had as provided in the Act. Recognizing that consequential damages may be a subject of agreement between the parties, § 2–719(3) provides:

> "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

N.J.Stat.Ann. § 12A:2–719(3) (West 1962).

Several cases have held that when a limited remedy fails of its purpose, an exclusion of consequential damages also falls, but approximately the same number of deci-sions have treated that preclusion as a separate matter. New Jersey has not taken a position on this question, so in this diversity case we must predict which view the New Jersey Supreme Court would adopt if the question were presented to it.

■ It appears to us that the better reasoned approach [3] is to treat the consequential damage disclaimer as an independent provision, valid unless unconscionable. This poses no logical difficulties. A contract may well contain no limitation on breach of warranty damages but specifically exclude consequential damages. Conversely, it is quite conceivable that some limitation might be placed on a breach of warranty award, but consequential damages would expressly be permitted.

The limited remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty. *See id.* § 12A:2–719(1)(a); *Beal v. General Motors Corp., supra.* The Code, moreover, tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable.[4] We therefore see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract, without more, invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive.

■ Whether the preclusion of consequential damages should be effective in this case depends upon the circumstances involved. The repair remedy's failure of essential purpose, while a discrete question, is not completely irrelevant to the issue of the conscionability of enforcing the consequen-

3. The most recent case to treat the issue in some detail is *S. M. Wilson & Co. v. Smith Int'l, Inc., supra.* For a student comment on the case, see Note, *The Validity of Consequential Damage Disclaimers Following Failure of Essential Purpose of an Exclusive Remedy: S. M. Wilson & Co. v. Smith International, Inc.,* 33 S.W.L.J. 930 (1979).

4. Official Comment 1 to U.C.C. § 2–719 states that "any clause purporting to limit the remedial provisions in an unconscionable manner is subject to deletion and in that event the remedies made available by the article are applicable as if the stricken clause had never existed." See Anderson, *Failure of Essential Purpose and Essential Failure On Purpose: A Look At Section 2–719 Of The Uniform Commercial Code,* 31 S.W.L.J. 759, 767 (1977); Eddy, *On the Essential Purposes of Limited Remedies: The Metaphysics of U.C.C. Section 2–719(2),* 65 Cal.L. Rev. 28 (1977).

tial damages exclusion. The latter term is "merely an allocation of unknown or undeterminable risks." U.C.C. § 2–719, Official Comment 3, N.J.Stat.Ann. § 12A:2–719, at 537 (West 1962). Recognizing this, the question here narrows to the unconscionability of the buyer retaining the risk of consequential damages upon the failure of the essential purpose of the exclusive repair remedy.

One fact in this case that becomes significant under the Code is that the claim is not for personal injury but for property damage. Limitations on damages for personal injuries are not favored, but no such prejudice applies to property losses. It is also important that the claim is for commercial loss and the adversaries are substantial business concerns. We find no great disparity in the parties' bargaining power or sophistication. Apparently, Chatlos, a manufacturer of complex electronic equipment, had some appreciation of the problems that might be encountered with a computer system. Nor is there a "surprise" element present here.[5] The limitation was clearly expressed in a short, easily understandable sales contract. This is not an instance of an ordinary consumer being misled by a disclaimer hidden in a "linguistic maze." *Cf. Gladden v. Cadillac Motor Car Division*, 83 N.J. 320, 416 A.2d 394 (1980).

Thus, at the time the contract was signed there was no reason to conclude that the parties could not competently agree upon the allocation of risk involved in the installation of the computer system.

From the perspective of the later events, it appears that the type of damage claimed here came within the realm of expectable losses. Some disruption of normal business

routines, expenditure of employee time, and impairment of efficiency cannot be considered highly unusual or unforeseeable in a faulty computer installation. Moreover, although not determinative, it is worth mentioning that even though unsuccessful in correcting the problems within an appropriate time, NCR continued in its efforts. Indeed, on the date of termination NCR was still actively working on the system at the Chatlos plant. In fact, the trial court thought that Chatlos should have cooperated further by accepting the installation of the programs.[6] This is not a case where the seller acted unreasonably or in bad faith.

In short, there is nothing in the formation of the contract or the circumstances resulting in failure of performance that makes it unconscionable to enforce the parties' allocation of risk. We conclude, therefore, that the provision of the agreement excluding consequential damages should be enforced, and the district court erred in making an award for such losses.

IV

As we said earlier, since there was a breach of warranty, damages were appropriate on that score. The district judge looked to U.C.C. § 2–714(2), which sets out the measure of damages for breach when the claim is for accepted goods,[7] as the difference "between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." N.J.Stat.Ann. § 12A:2–714(2) (West 1962). In applying this provision, the judge first determined the value of the goods had they met the warranty. He discarded "market value"

---

5. *See* Murray, *Unconscionability: Unconscionability*, 31 U.Pitt.L.Rev. 1 (1969).

6. The court limited Chatlos's award for consequential damages to the period before September 2, 1976, concluding that the buyer had an obligation to minimize his damages in good faith, *see* New Jersey Study Comment 2, N.J. Stat.Ann. § 12A:2–715, at 519–20 (West 1962), and had additional time been granted, the installation might have been completed. Appar-

ently the trial court thought that further tolerance by Chatlos would have been the least expensive variant of cover.

7. The district court accepted NCR's position that in September 1976 it no longer had any ownership interest and therefore could not retake the equipment. Thus, Chatlos was unable to revoke its acceptance and could not invoke U.C.C. §§ 2–712 or 2–713.

because that term was "conspicuously lacking" from § 2–714, and began with $70,162.09, the amount Chatlos was required to pay the bank. That sum included the amount the defendant received, sales tax, and interest. The court added the $5,621.22 Chatlos paid for the service contract because it was an inseparable element of the entire transaction.

The plaintiff contends that the correct starting point is market value, an amount its expert testified was substantially in excess of the contract price. To use contract price in this case, argues Chatlos, deprives it of the benefit of its bargain.

It is true that § 2–714 does not use the term market value and thus introduces a degree of flexibility into the damage computation. Although fair market value is not referred to in § 2–714, that standard has been employed by some courts, *see Soo Line R.R. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977), and considered by textwriters as "the most appropriate measure of the value of the goods as guaranteed." J. White & R. Summers, Uniform Commercial Code § 102, at 380 (2d ed. 1980). If the value of the goods rises between the time that the contract is executed and the time of acceptance, the buyer should not lose the advantage of a favorable contract price because of the seller's breach of warranty. Conversely, if the value drops, the seller is entitled to the resulting lower computation.

■ It may be assumed that in many cases fair market value and contract price are the same, and therefore, if a party wishes to show a difference between the two he should produce evidence to that effect. But here as we read his opinion, the district judge felt compelled to disregard all considerations of market value. We hold, however, that the court should consider that factor as the starting point.

■ The court included in the value of the goods as warranted the interest paid to the bank on the purchase price. In the absence of special circumstances, interest is not a proper factor to be considered. Interest represents the cost of the money borrowed to buy the goods because capital was not available to make a cash purchase. If, however, the buyer is awarded lump sum damages, he would be able to make a replacement purchase without borrowing and incurring interest expenses. To the extent, therefore, that the recovery included interest on the original purchase, it would constitute a windfall. With today's rapidly changing interest structures, however, it may be that the buyer can demonstrate some actual loss. We have difficulty envisioning such a scenario, but leave the plaintiff free to present the matter to the district court on remand. *Cf.* J. White & R. Summers, *supra* § 10–2, at 380 n.18.

■ In calculating the other element of the formula, the value of the goods as accepted, $12,630.55 was added to the value of the hardware to compensate for the benefit Chatlos received from using the system's payroll function. The court arrived at this figure by dividing the contract price of the computer system by six, the number of functions to have been provided. Although the benefit Chatlos received should be taken into account, the parties agree that there is no evidence in the record to show that each function had the same value. That issue, too, may be addressed on remand.

■ The plaintiff's final contention is that it is entitled to prejudgment interest. Because the district judge's opinion does not reveal whether he exercised his discretion in this matter, we intimate no view on the merits of the claim and expect that the court will rule on the issue on remand.

Accordingly, the judgment of the district court will be affirmed insofar as it imposes liability on the defendant to pay damages to the plaintiff. The case will be remanded for a redetermination of the award in accordance with this opinion.