

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-24-1999

# Carter v. Exxon Company USA

Precedential or Non-Precedential:

Docket 97-5248,97-5272

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Carter v. Exxon Company USA" (1999). *1999 Decisions.* Paper 140.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/140

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 24, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5248

RICHARD CARTER; CAROL CARTER,
husband and wife, d/b/a Forsum, Inc.;
FORSUM, INC.,
      Appellants

v.

EXXON COMPANY USA, a division of
EXXON CORPORATION,

EXXON CORPORATION,
      Defendants/Third-Party Plaintiffs

v.

PETROLEUM TECHNOLOGIES, INC.
      Third-Party Defendant

No. 97-5272

RICHARD CARTER; CAROL CARTER,
husband and wife, d/b/a Forsum, Inc.;
FORSUM, INC.,

v.

EXXON COMPANY USA, a division of
EXXON CORPORATION; EXXON CORPORATION,
      Defendants/Third-Party Plaintiffs

v.

PETROLEUM TECHNOLOGIES, INC.
        Third-Party Defendant

EXXON CORPORATION,
        Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D. C. Civil No. 93-0238)
District Judge: Hon. Mary L. Cooper

Argued: May 21, 1998

Before: SLOVITER, GREENBERG, Circuit Judges, and
GIBSON, Senior Circuit Judge.*

(Filed: May 24, 1999)

        Andrew J. Stern (ARGUED)
        David A. Yanoff
        Beasley, Casey & Erbstein
        Philadelphia, PA 19107

         Attorneys for Appellants in
         No. 97-5248

        Steven J. Fram (ARGUED)
        Archer & Greiner
        Haddonfield, New Jersey 08033

         Attorney for Appellant in
         No. 97-5272

OPINION OF THE COURT

JOHN R. GIBSON, Senior Circuit Judge.

Richard Carter and his wife, Carol, appeal and argue that
_____

*The Honorable John R. Gibson, Senior United States Circuit Judge for
the Eighth Circuit Court of Appeals, sitting by designation.

the district court erred in granting summary judgment in favor of Exxon Company USA on their Petroleum Marketing Practices Act[1] claim and on Exxon's state law counterclaim. They also contend, with respect to their state law contract claims, that the district court erred in instructing the jury, in interpreting and analyzing for unconscionability disclaimers in their franchise agreement with Exxon, in barring recovery of any damages that accrued after their franchise agreement was not renewed, and in holding that a jury finding was not against the clear weight of the evidence. Exxon cross appeals, contending that the district court erred by applying the disclaimers to only one of the Carters' contract claims and abused its discretion by granting the Carters leave to amend their complaint. We reverse the grant of summary judgment on the Carters' Petroleum Marketing Practices Act claim and on Exxon's counterclaim. We conclude the district judge erred in instructing the jury on waiver and reverse the judgment on the Carters' state law contract claims. We affirm the district judge's holding that the contract disclaimers do not bar the Carters from recovering business loss on one of their contract claims and affirm the district judge's holding that the Carters may not recover, on their contract claim, business loss occurring after their franchise agreement was not renewed. We remand for further proceedings in accordance with this opinion.

In 1986, the Carters began operating an Exxon service station in Wrightstown, New Jersey. Carter had previously been in the trucking business, but planned to make the service station his only business. The Carters formed a corporation, Forsum, Inc., for the purpose of operating the station. Because Exxon did not own the real property where the station was located, Carter entered into a lease with Thomas and Alma Davis, the owners of the real property. From the inception of the franchise, the Carters and Exxon discussed the possibility of upgrading the station or rebuilding the station (the "hi-grade" plan), but this never materialized.

---

1. The relevant provisions of the Act are codified at 15 U.S.C. SS 2801-2806 (1994).

Carter renewed the franchise on July 20, 1989, effective through August 1, 1992. The renewal was memorialized in a "Sales Agreement" and a "Rental Agreement." The Sales Agreement had a provision disclaiming consequential damages, and the Rental Agreement had a provision disclaiming damages, including loss of business resulting from repairs performed on the loaned equipment.

In late September 1990, the Carters reported a leak in the "plus" tank, one of three underground gasoline storage tanks. Exxon, which owned and was responsible for the tanks, confirmed the leak and sent out a work crew to perform the repairs. On October 15, 1990, the work crew emptied the "plus" tank to test the repair. On October 18, 1990, the buoyant force of ground water forced the tank to emerge from the ground, which in turn caused the "supreme" tank to take on water.[2] During the repair of the "supreme" tank, it too emerged from the ground causing damage to the "regular" tank. After two weeks in which the Carters were left with no operational tanks, Exxon repaired the "regular" tank, but the Carters were left with only one working tank for nine months, allowing them to sell only one type of gasoline.

After the tanks surged, the Carters had several meetings with various Exxon employees including David O'Connor, business counselor for the Carters' account, Anthony Luciano, district manager for southern New Jersey, and Richard Biedrzycki, Exxon's outside counsel. In the meetings, the parties discussed several issues. Carter expressed his desire that Exxon immediately replace his tanks, keeping them at their old site, while Exxon expressed renewed interest in the "hi-grade" plan, which would involve replacing the tanks in a new site to suit the larger facility. Exxon, unable to convince Carter to agree to

_____

2. Exxon engineers recognized the risk of the tanks emerging. Two methods of combating this risk are securing the tank with straps and filling it with liquid. Carter claimed that some straps were missing while others were broken. Also, failed communications between the work crew and the fire department resulted in the "plus" tank not being filled with water from October 16, 1990 to October 18, 1990. Carter used these occurrences as part of the basis for his state law claims, and the jury resolved these claims in favor of Carter.

4

the "hi-grade" plan, eventually decided in mid-May to replace the tanks in their old site, and the work was completed in July 1991. In bringing all three tanks to working order, Exxon filled them with hold-down loads of gasoline.

After the tanks were replaced, the parties continued to discuss variations of the "hi-grade" plan, but also discussed a franchise renewal, a covenant not to sue for damages arising out of the tank repair, and monies Exxon claimed were due for various items, one of which was a charge for the gasoline used to refill the tanks during the repairs. The discussions took a turn for the worse after a stormy meeting on June 3, 1992, abruptly terminated by the Carters' attorney, Gerald Haughey. After meetings on June 18 and July 8, 1992, the parties still could not resolve their differences. A critical point of dispute between the parties is whether Exxon, in the course of these meetings, ever offered the Carters a franchise renewal without conditioning it on their assent to other agreements including the covenant not to sue and investment and amortization agreements related to the "hi-grade" plan.

The parties ultimately did not agree on a renewal of the franchise, and Exxon sent the Carters a termination notice in late July 1992. The Carters vacated the premises by the end of September. Exxon entered a franchise agreement for the same premises with the Davises' son-in-law, Wayne Bird. The Carters filed this lawsuit.

The Carters and Forsum asserted a violation of the Petroleum Marketing Practices Act ("Petroleum Act"), breach of contract, negligence, tortious interference with business relationship, and tortious interference with prospective economic advantage. Exxon filed a counterclaim alleging that Carter had failed to pay Exxon monies due under their franchise agreement.

The district court dismissed the Carters' Petroleum Act claims on the grounds that only Forsum had standing to sue under the Petroleum Act, and dismissed Carol Carter and Forsum's tortious interference claims. The district court granted summary judgment in favor of Exxon on the claims of violation of the Petroleum Act, negligence,

interference with business relationship, and interference with prospective economic advantage. The district court also granted summary judgment, as to liability only, in favor of Exxon on its counterclaim.

The trial was bifurcated, and the case was submitted to the jury to resolve the Carters' breach of contract claim and the appropriate amount of damages on Exxon's counterclaim. The Carters' contract claim was two-fold. They alleged Exxon had breached its contractual duties by failing to make the tank repairs in a good and workmanlike manner and to make the repairs in a reasonable time. The jury returned a verdict on liability in favor of the Carters on both theories; however, the liability verdict was mitigated by the jury's finding that the Carters had waived Exxon's contractual duty to repair in a reasonable time for the period of October 18, 1990, to December 30, 1990. After the district judge made post-verdict rulings on damage issues based upon the disclaimers in the franchise agreement and accrual of damages after termination of the franchise agreement, the parties stipulated that the Carters' damages for breach of contract were $40,000 and Exxon's damages on its counterclaim were $40,000. This appeal and cross-appeal followed.

The Carters argue the district court erred in granting summary judgment on the Petroleum Act claim and in granting summary judgment on Exxon's counterclaim. They further contend that the district court's jury instruction on waiver was erroneous, that the district court erred in applying the disclaimers to bar their claim for consequential damages for breach of duty to repair in a good and workmanlike manner, that the district court erred by barring the recovery of any damages for the time period after the franchise agreement was not renewed, and that the jury's finding that ninety days was a reasonable repair period was against the clear weight of the evidence. Exxon contends that the district court erred by applying the disclaimers to only one of the Carters' contract claims. It contends the disclaimers should also bar recovery of consequential damages on the Carters' claim for breach of duty to repair in a reasonable time. It also contends the district court abused its discretion by granting the Carters leave to amend their complaint.

6

I. Summary Judgment on Petroleum Act

The Carters3 argue that the non-renewal of their
franchise agreement violated the Petroleum Act. Congress
enacted the statute for the purpose of protecting
franchisees, who generally have inferior bargaining power
when dealing with franchisors, from unfair termination or
nonrenewal of their franchises. See S. Rep. No. 95-731, at
17-19, (1978), reprinted in 1978 U.S.C.C.A.N. 873, 875-77.
However, Congress also provided franchisors with some
flexibility to terminate franchise relationships by delineating
specific provisions which indicate when a franchisor may
permissibly terminate a franchise agreement. See 15 U.S.C.
S 2802(b)(3). The district court granted summary judgment
against the Carters based upon such a provision.
Specifically, the district court relied upon section 2802(b)(3)
of the Petroleum Act which states:

> [T]he following are grounds for nonrenewal of a
> franchise relationship:
>
> (A) The failure of the franchisor and the franchisee to
> agree to changes or additions to the provisions of the
> franchise, if --
>
> (i) such changes or additions are the result of
> determinations made by the franchisor in good faith
> and in the normal course of business . . . .

15 U.S.C. S 2802(b)(3).

When the franchisor terminates or does not renew a
franchisee's contract, the burden falls upon the franchisor
to prove that it declined to renew for one of the permissible
reasons set forth in the Petroleum Act. See Lugar v. Texaco,
Inc., 755 F.2d 53, 56 (3d Cir. 1985); Sun Refining and
Marketing Co. v. Rago, 741 F.2d 670, 672 (3d Cir. 1984); 15
U.S.C. S 2805(c).

Summary judgment may only be granted "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
_____

3. The district court held that Forsum, the Carters' corporation, was the
party with standing to bring the Petroleum Act claim; we refer to the
Carters for simplicity.

7

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating that the standards of Rule 56(c) have been satisfied. See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). When a court is deciding a motion for summary judgment, "inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993). The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See id. (quotations omitted). If the non-movant has offered more than a "scintilla" of evidence, the judge may not discredit the non-movant's evidence even if the movant's evidence far outweighs that of the non-movant. See id. Our review of the district court's decision is plenary, and we use the same standard the district court should use in the first instance. See Patel v. Sun Co., 141 F.3d 447, 451 (3d Cir. 1998).

The parties dispute whether there is a genuine issue of material fact as to whether Exxon offered the Carters an unconditional renewal of their franchise agreement. The Carters claim that the renewal of the franchise agreement was conditioned upon their assent to other agreements, including the covenant not to sue and investment and amortization agreements related to the "hi-grade" plan. Exxon claims that it offered the Carters a franchise agreement without any strings attached. If Exxon conditioned the renewal offer upon Carter's assent to these agreements, then the non-renewal did not comply with the Petroleum Act. See 15 U.S.C. SS 2802(b)(3) and 2805(f). The district court so stated the issue on the summary judgment motion. We must review the record in the light most favorable to the Carters and determine if there is a genuine issue of material fact as to whether Exxon conditioned its renewal offer upon these agreements. We are persuaded that a genuine issue of material fact exists.

8

Carter testified several times at deposition that Exxon's offer of a franchise renewal was conditioned upon his assent to other agreements. In Carter's words, "[A] sales agreement on its own, alone, was never offered to me," and "[T]he way it was offered was in a package . . . if I signed a full release, if I put $30,000 in the building . .. ." Carter addressed the June 1992 time period which was crucial to the district court's reasoning. When asked if Exxon had offered him a franchise agreement before July 2, 1992, Carter responded "[I]n some form of package form, I believe so . . . ." Carter specifically defined the package as a general release for claims arising from the tank damage, an agreement to upgrade the station with $30,000 of improvements, an amortization agreement, and an agreement to clear the debt Carter allegedly owed Exxon from past transactions, including the gasoline used to fill the tanks during repair.

Other evidence on the record indicates that there is a genuine factual issue as to whether the offer was unconditional. Haughey, who was present at the meeting of June 3, 1992, testified that Exxon was "tying" the renewal of the sales agreement to the damage of the tanks and had been doing so "from the beginning." Carol Carter testified that every time Exxon made an offer, the Carters were not free to sign only the franchise agreement. In her words, "You couldn't pick up one so [sic] stack and say, okay, I'll take this and leave the other two. They were set in front of you as a whole and this is what you had to decide on. You had to sign all three." Exxon's own employees testified that before June 1992, Exxon offered package deals. O'Connor testified that in October 1991, he communicated with Exxon's attorneys regarding an offer to the Carters that contained a covenant not to sue and an amortization agreement. Further, Luciano testified that Exxon offered Carter a deal in which Carter would receive a new franchise agreement, but also would have to sign a covenant not to sue.

Moreover, the evidence cited by the district court and Exxon does not persuade us that there is no genuine issue of material fact. Both the district court and Exxon rely heavily on O'Connor's testimony that there were no

9

conditions placed on the June 18, 1992, offer of a new franchise agreement. However, that testimony is in direct conflict with Carter's testimony that he was never offered a franchise renewal with no strings attached. When the non-movant's evidence contradicts the movant's, the non-movant's must be taken as true. See Big Apple BMW, Inc., 974 F.2d at 1363. Instead, the district court accepted Exxon's, the movant's, evidence as true. The district court and Exxon also make much of Carter's admission that on June 3, 1992, Exxon never explicitly stated that the offer was conditioned upon his assent to other agreements. However, as Carter's testimony shows, Exxon certainly did not explicitly tell him that the offer was not conditioned upon other agreements, as Exxon had indicated in the past. Carter's statement at most represents an ambiguity in his testimony. Ambiguities in deposition testimony are for the jury to resolve. See Meinhardt v. Unisys Corp., 74 F.3d 420, 433 n.10 (3d Cir.), cert. denied, 519 U.S. 810 (1996).[4] The district court also relied on a letter Haughey wrote on January 2, 1992, requesting that Exxon handle the renewal of the franchise agreement and the damage to the tanks as two distinct issues and a letter Biedrzycki wrote in July of 1992, indicating that Exxon was treating the matters separately. In the district court's opinion, the letters showed that both parties understood that the franchise renewal was distinct from discussions relating to the damaged tanks. However, the inference the district court drew from the correspondence is too broad and certainly not in the Carters' favor. The letter only directly shows that Haughey was asking for the issues to be treated separately, and at one point in July, Exxon indicated that they were. It does not directly show that Exxon made an unconditional offer, and inferring that it does is inappropriate on summary judgment.

_____

4. Exxon also relies upon on a statement that Carter made in a meeting in July 1992 indicating that he had no choice but to cease operations. Exxon claims that this amounts to a rejection of a franchise agreement. Carter's statement, however, does not show that Exxon made an unconditional offer. Read in a light most favorable to Carter, the statement only shows that Carter could not continue his operations if he was forced to agree to Exxon's package offer--including his waiver of claims arising out of the tank replacement.

10

In short, the district court failed to place the events of June and July in context with the previous relations between the parties and only accepted Exxon's version of the events. The record, when viewed in the light most favorable to the Carters, reveals that a genuine issue of material fact exists as to whether the renewal offer was conditional. We therefore reverse the grant of summary judgment for Exxon.

II. Summary Judgment on Counterclaim

The district court entered summary judgment for Exxon on its counterclaim, which alleged that Carter owed Exxon for purchases of gasoline under the agreement.5 The district court held that Carter had not contested his liability as to the items in question. While the court lacked documentation as to amounts, it found it appropriate to grant Exxon's motion for summary judgment on the issue of liability. The parties later stipulated the amount of this debt as $40,000.

The Carters argue the debt arose almost entirely from the loads of gasoline used to hold the tanks down during repair. Luciano, Exxon's employee, testified that the indebtedness arose from the hold-down gasoline used for the three tanks. The Carters further argue that they did not expressly or impliedly promise to pay for the hold-down loads as they did not order the gasoline; thus, Exxon could only recover in quasi-contract, a theory of recovery Exxon did not allege. The franchise agreement states that "[Gasoline] shall be delivered by Seller to Buyer at the premises in the quantities ordered by Buyer." Carter testified that he did not order the hold-down loads. Luciano testified that the Carters disputed the amount of the debt. O'Connor testified that there was a dispute regarding monies allegedly due for fuel used in the tank replacement. Applying the standards stated above, we conclude this

_____

5. Exxon also asserts that the Carters' alleged failure to pay the debt is a basis for granting summary judgment in its favor on the Carters' Petroleum Act claim. The district court did not base its grant of summary judgment on the Petroleum Act claim upon this debt; thus, we do not address it in relation to the Petroleum Act claim.

11

evidence compels the rejection of summary judgment on
Exxon's counterclaim.

III. Jury Instruction on Waiver

The case went to the jury on the Carters' breach of
contract claims, and the jury found that the Carters waived
performance of Exxon's contractual duty to repair the tanks
from October 18, 1990, to December 30, 1990. The Carters
argue that the court erred in instructing the jury that
waiver could be found based upon "inaction or silence." The
Carters timely objected to the instruction. We must
determine whether the jury instructions as a whole stated
the correct legal standard. See Ryder v. Westinghouse Elec.
Corp., 128 F.3d 128, 135 (3d Cir. 1997), cert. denied, 118
S.Ct. 1052 (1998). "If, looking at the charge as a whole, the
instructions were capable of confusing and thereby
misleading the jury, we must reverse." Mosley v. Wilson,
102 F.3d 85, 94 (3d Cir. 1996) (quotations omitted).

The breach of contract claim was asserted under New
Jersey law, and we look to New Jersey law to determine the
applicable definition of waiver. The Supreme Court of New
Jersey in West Jersey Title & Guaranty Co. v. Industrial
Trust Co., 141 A.2d 782 (N.J. 1958), held that waiver
requires "a clear, unequivocal, and decisive act of the party
showing such a purpose or acts amounting to an estoppel
on his part . . . ." Id. at 787. See also Petrillo v. Bachenberg,
623 A.2d 272, 276 (N.J. Super. Ct. App. Div. 1993), aff 'd,
655 A.2d 1354 (N.J. 1995); Country Chevrolet, Inc. v.
Township of North Brunswick Planning Bd., 463 A.2d 960,
962 (N.J. Super. Ct. App. Div. 1983). New Jersey law thus
requires a decisive act, rather than mere inaction, as a
basis for waiver, and we conclude the district court's
instruction was contrary to New Jersey law.

Moreover, during closing argument, Exxon's counsel
argued that the Carters' silence in the face of the
destruction of the tanks and Exxon's corresponding "hi-
grade" proposal made it reasonable for Exxon to proceed on
the proposals, rather than to start replacing the tanks. The
district court instructed the jury that it mustfind a waiver
if the Carters expressly agreed to or clearly acquiesced in a

12

delay of performance under the contract which reasonably led Exxon to believe that the Carters would not insist the tanks be repaired or replaced. Introducing the issue of Exxon's reasonable belief is also contrary to New Jersey law, and further compounded the error. See Petrillo, 623 A.2d at 272, 276 (holding that it is erroneous to define waiver as conduct causing an objective observer to believe party had relinquished her rights). Including inaction, silence, and reasonable belief in the definition of waiver creates an incorrect statement of the legal standard and could confuse the jury as to the basis for waiver. The district court's instruction is reversible error.

IV. Damages

A.

The franchise relationship between Carter and Exxon was memorialized in the Sales Agreement and the Rental Agreement. Each had a provision disclaiming damages.

Paragraph three of the Rental Agreement states:

> Upon written notice from the Lessee, Lessor shall make all repairs to the equipment leased hereunder which are not Lessee's responsibility as described in Exhibit A; provided, however, that such repairs are, in Lessor's sole judgment, necessary in consideration of the remaining term of this agreement or have not been caused by negligence or misuse of Lessee or Lessee's employees, agents, representatives or contractors. Lessor and its designees shall have the right to enter the premises at any time to inspect, repair, or replace the equipment, and Lessor shall have no obligation to reimburse Lessee for any loss of business by Lessee or other damages resulting from these activities by Lessor.

Paragraph twenty-six of the Sales Agreement states:

> DAMAGES: NO CLAIM SHALL BE MADE UNDER THIS CONTRACT FOR SPECIAL, OR CONSEQUENTIAL DAMAGES, EXCEPT AS PROVIDED OTHERWISE BY LAW.

13

The district court held that it did not need to look to paragraph twenty-six of the Sales Agreement because paragraph three of the Rental Agreement was more applicable to tank replacement. After determining that paragraph three was not unconscionable, the district court held that it barred the Carters' recovery of consequential damages on their claim for breach of duty to repair in a good and workmanlike manner, but did not bar the Carters' recovery of consequential damages on their claim for breach of duty to repair in a reasonable time. Each party claims the district court's holding was erroneous. The Carters claim that both paragraph three and paragraph twenty-six are inapplicable, and, in the alternative, they are unconscionable. Exxon disputes the Carters' claims and further contends that the district court erred by not applying paragraphs three and twenty-six to the Carters' claim for breach of duty to repair in a reasonable time. Thus, we must first determine whether the proper interpretation of the contract bars the Carters' recovery of consequential damages and then determine whether the contract, properly interpreted, is unconscionable.

Franchise agreements governed by the Petroleum Act are to be interpreted according to state contract law.6 See Lippo v. Mobil Oil Corp., 776 F.2d 706, 712 (7th Cir. 1985). We thus look to New Jersey's law of contract interpretation. New Jersey's fundamental rule of contract interpretation is

_____

6. Rental agreements are interpreted and analyzed for unconscionability in the same way as contracts. We need not consider whether New Jersey's version of the Uniform Commercial Code applies to this rental agreement. On the state law issues before the court today--waiver, interpretation, unconscionability, and consequential damages--the U.C.C. analysis and the common law contract analysis lead to the same result. See N.J. Stat. Ann. SS 12A:2-209 (West 1962) (not defining waiver) and 12A:2-208 (West 1962) (New Jersey Study Comment). Compare N.J. Stat. Ann. S 12A:2-301 (West 1962) (U.C.C. Comment) with Jacobs v. Great Pacific Century Corp., 518 A.2d 223, 224, 227 (N.J. 1986) (interpretation). Compare Chatlos Systems, Inc. v. National Cash Register Corp., 635 F.2d 1081, 1086-87 (3d Cir. 1980) with Howard v. Diolosa, 574 A.2d 995, 999 (N.J. Super. Ct. App. Div. 1990) (unconscionability), certification denied, 585 A.2d 409 (N.J. 1990). Compare N.J. Stat. Ann. S 12A:2-715 (West 1962) (New Jersey Study Comment) with Donovan v. Bachstadt, 453 A.2d 160, 165-66 (N.J. 1982) (consequential damages).

that the court is to ascertain the parties' intent from what was written and the surrounding circumstances. See Jacobs v. Great Pacific Century Corp., 518 A.2d 223, 224, 227 (N.J. 1986); Tessmar v. Grosner, 128 A.2d 467, 471 (N.J. 1957). Our review of the district court's interpretation of the contract is plenary. See Smithkline Beecham Corp. v. Rohm and Hass Co., 89 F.3d 154, 159 (3d Cir. 1996); Jumara v. State Farm Ins. Co., 55 F.3d 873, 880–81 (3d Cir. 1995).

The parties make much of whether the Sales Agreement and the Rental Agreement are one agreement or two. Exxon argues that they are one agreement; therefore, paragraph twenty-six of the Sales Agreement applies to losses resulting from the repair of the tanks, and paragraph twenty-six is so broad that it does not leave room for the district court's distinction between manner and time of repair. The Sales Agreement refers to attachments, and its language makes evident that the Rental Agreement was an attachment to it. The Rental Agreement is not only entitled a "Rider to the Sales Agreement," but commences with reference to the buyer's purchase of products as defined in the Sales Agreement. However, whether the parties have one or two agreements is not determinative of the issue before us.

Contract provisions are to be interpreted so as to give each provision meaning, rather than rendering some provisions superfluous. See, e.g., Ehnes v. Hronis, 23 A.2d 592, 593 (N.J. 1942); United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983); Embassy Moving & Storage Co. v. United States, 424 F.2d 602, 606 (Ct. Cl. 1970). Exxon's reading of paragraph twenty-six of the Sales Agreement renders superfluous the disclaimer language in paragraph three of the Rental Agreement, which specifically addresses the parties' respective duties for the upkeep of the equipment and which disclaims business loss resulting from repair of the equipment. The reading of the two agreements which gives independent meaning to paragraph three of the Rental Agreement is that paragraph twenty-six of the Sales Agreement does not apply to losses stemming from tank repair. The disclaimers in paragraph twenty-six of the Sales Agreement and

15

paragraph three of the Rental Agreement apply to different aspects of the contractual relationship between the parties.

The critical phrase of paragraph three of the Rental Agreement is: "[Lessor] shall have the right to enter the premises at any time to inspect, repair, or replace the equipment, and Lessor shall have no obligation to reimburse Lessee for any loss of business by Lessee or other damages resulting from these activities . . . ." The business loss on the breach of duty to repair in a good and workmanlike manner claim results from Exxon's repair of the equipment and is barred by the disclaimer.

We believe, however, that New Jersey's contract interpretation principles lead to the conclusion that the Carters may recover business loss for breach of duty to repair in a reasonable time.

"An agreement . . . must be accorded a rational meaning in keeping with the express general purpose." Tessmar v. Grosner, 128 A.2d 467, 471 (N. J. 1957). "[T]he most fair and reasonable construction, imputing the least hardship on either of the contracting parties should be adopted . . . so that neither will have an unfair or unreasonable advantage over the other." Id. (citations omitted).

Paragraph three only bars damages "resulting from" repair and does not refer to failure to commence repairs or the timeliness of repairs. An interpretation of this language that allows Exxon to delay commencement of tank replacement and not make the replacement in a reasonable time is not the most reasonable or fair because it substantially undermines the right to repairs that Exxon gave Carter.7 Further, allowing Exxon an unlimited time to make the repairs gives it an unfair advantage in this case

_____

7. Exxon claims that it did not commence tank replacement because after the tanks surged, the Carters negotiated with them about making the "hi-grade" improvement. However, Carter testified that he told Exxon that he was not interested in the "hi-grade" improvement and wanted his tanks replaced in their old site. This factual dispute goes to the merits of Exxon's waiver defense, which the jury resolved by finding that Carter waived his right to have the tanks timely replaced from October 18, 1991 to December 30, 1991. The waiver issue must be retried with the proper jury instruction.

16

where the delay could have compelled Carter into assenting to the "hi-grade" improvement. It is also not in accord with the general purpose of the agreement, the sale of gasoline. If Exxon truly was bargaining for exculpation from damages regardless of the length of time it took them to make repairs, it should have drafted the contract explicitly excluding damages for untimely repair.

While the exculpatory clause in a commercial lease was held not to exculpate a landlord from his own negligence unless the clause expressly so stated, see Carbone v. Cortlandt Realty Corp., 277 A.2d 542, 543 (N.J. 1971), the principle is also applicable in this case. Exxon's delay, like Cortlandt's negligence, was a subject that required an explicit disclaimer.

Considering the stake Carter had in his franchise and the imprecise language of the disclaimer, we are not persuaded that Carter agreed to incur the risk that Exxon would delay the commencement of tank replacement and not perform the required repair or replacement in a reasonable time.

B.

Even if we were to interpret the disclaimer as Exxon proposes, we would conclude the contract is unconscionable to the extent that it shields Exxon from damages resulting from its failure to repair or replace the tanks in a reasonable time. Unconscionability is a question of law for the court to decide. N.J. Stat. Ann. S 12A:2-302 (West 1962). In determining whether a contract is unconscionable, courts focus on the bargaining power of the parties, the conspicuousness of the putative unfair term, and the oppressiveness and unreasonableness of the term. See, e.g., Chatlos Systems, Inc. v. National Cash Register Corp., 635 F.2d 1081, 1086-87 (3d Cir. 1980); Gladden v. Cadillac Motor Car Division, 416 A.2d 394, 403 (N.J. 1979) (concurring opinion).

In this case, while we recognize that the Carters had discussions with other franchisors, there is no doubt that their bargaining power was substantially less than Exxon's. See S.Rep. No. 95-731, at 17-18, (1978), reprinted in 1978 U.S.C.C.A.N. 873, 875-76. The Petroleum Act might protect

17

the Carters from unfair renewal decisions, but there remains a wide disparity in bargaining power with regard to other aspects of the relationship.

Furthermore, the disclaimer is not adequately conspicuous. The paragraph is not titled, and the critical language limiting Exxon's liability is not capitalized or highlighted. Thus, there is no indication that this far-reaching disclaimer might be of greater importance than other provisions of the paragraph or the agreement. The lack of a title or highlighting is particularly disturbing because the disclaimer is buried in a paragraph which purports to confer the benefit of repairs made at Exxon's expense. Indeed, in a single-spaced paragraph, which for the first eight and one-half lines discusses only the duty to repair, it is not until the last clause of the third sentence beginning on the last half of the eighth line, that the disclaimer of liability is reached. In this respect, the case is similar to Jutta's Inc. v. Fireco Equipment Co., 375 A.2d 687 (N.J. Super. Ct. App. Div. 1977), in which the court struck down a limitation on damages which appeared at the end of a paragraph conferring a guarantee. See id. at 690. While the paragraph in Jutta's was more deceiving because it was titled "Distributor's Guarantee," placing the disclaimer far down in a paragraph which otherwise seems to confer benefits, without any demarcation at all, falls short of being conspicuous. See N.J. Stat. Ann. S 12A:1-201(10) (West Cum. Supp. 1998) (describing language as conspicuous if it is in larger or contrasting type).

Finally, the disclaimer, as Exxon would have us interpret it, would be oppressive and unreasonable. In some respects, this case is similar to Kearney & Trecker Corp. v. Master Engraving Co., 527 A.2d 429 (N.J. 1987). There the New Jersey Supreme Court considered whether a seller's disclaimer of consequential damages was enforceable when the seller's repair warranty had failed of its essential purpose.

Kearney adopted our reasoning in Chatlos Systems, Inc. v. National Cash Register Corp., 635 F.2d 1081 (3d Cir. 1980), and held that the fact that the seller's repair warranty had failed of its essential purpose does not alone render the disclaimer of consequential damages

18

unconscionable. See Kearney, 527 A.2d at 437–38. In the court's words:

> [New Jersey Law] does not require the invalidation of an exclusion of consequential damages when limited contractual remedies fail of their essential purpose. It is only when the circumstances of the transaction, including the seller's breach, cause the consequential damage exclusion to be inconsistent with the intent and reasonable commercial expectations of the parties that invalidation of the exclusionary clause would be appropriate . . . . For example, although a buyer may agree to the exclusion of consequential damages, a seller's wrongful repudiation of a repair warranty may expose a buyer to consequential damages not contemplated by the contract . . . .

> Id. at 438.

Kearney held that the disclaimer in question was not unconscionable as applied, considering the wide range of repairs possible for the complex controlled machine at issue and the repeated service calls made by the seller. See id. at 438–39.

In this case, Exxon did not repudiate its duty to repair. But, under Kearney, the issue is whether, considering the circumstances of the transaction and the nature of Exxon's breach, it is consistent with reasonable commercial expectations and the intent of the parties that the Carters bear the risk of loss of business stemming from Exxon's failure to repair or replace the tanks in a reasonable time.

The disclaimer makes no reference to failure to commence repairs or the timeliness of repairs. Most important is the nature of Exxon's breach. Even if the Carters waived their right to timely tank replacement through December 30, 1991, as the jury found, Exxon did not commence tank replacement until mid-May. The replacement of the tanks was not completed until mid-July, three and one-half months longer than the jury found to be a reasonable time for the replacement. Absent waiver or a similar defense, we conclude that the substantial delay in the commencement of tank replacement, with a resulting failure to replace in a reasonable time, is the kind of

19

breach, which causes unforeseen damage, such as the New Jersey Supreme Court referred to in Kearney.

Kearney relied on our decision in Chatlos Systems, Inc. v. National Cash Register Corp., 635 F.2d 1081 (3d Cir. 1980). In Chatlos, the buyer bought a computer system from the seller. The contract included a repair warranty and a consequential damage disclaimer. A year and a half after the sale, the system was not working properly, despite repeated repair efforts by the seller. The buyer sued for consequential damages. See Chatlos, 635 F.2d at 1084. In upholding the validity of the damage disclaimer against a claim that it was unconscionable, we stated, "[I]t is worth mentioning that even though unsuccessful in correcting the problems within an appropriate time [the seller] continued in its efforts . . . . This is not a case where the seller acted unreasonably or in bad faith." Id. at 1087. In this case, as we observed above, we do not see the kind of continuing effort to repair present in Chatlos, and the jury specifically found that Exxon breached a contractual obligation to make the repair or replacement within a reasonable time.

Even assuming Exxon's interpretation of the contract is correct, we conclude that the application of the disclaimer to damages resulting from Exxon's failure to repair or replace the tanks in a reasonable time is unconscionable. We reach this decision considering the precedent of Kearney, Chatlos, and Jutta's, the disparity in bargaining power between the parties, the inconspicuousness and imprecision of the disclaimer, and the substantial delay in the commencement of the tank replacement, which, absent waiver or a similar defense, was inconsistent with the parties' intent and reasonable commercial expectations.[8]

On their breach of duty to repair in a reasonable time claim, the Carters may recover business loss which, at the time the parties made the contract, was a reasonably foreseeable result of Exxon's breach and was a reasonably certain consequence of the breach. See Donovan v.

_____

8. The Carters' contention that it is unconscionable for the disclaimer to bar recovery on the breach of duty to repair in a good and workmanlike manner claim is without merit. That breach does not involve the kind of unforeseen damages to which Kearney refers.

Bachstadt, 453 A.2d 160, 165 (N.J. 1982). However, we affirm the district court's holding that on this breach of contract claim the Carters may not recover business loss on a hypothetical franchise agreement that would have taken effect after the franchise agreement expired in July 1992. We are persuaded that, as a matter of law, the nonrenewal of the franchise agreement and the lost opportunity to make profit on a new agreement was not a reasonably certain consequence of Exxon's delay in replacing the tanks. The delay and the ultimate tank replacement occurred more than a year before the franchise was not renewed, and during that year, the parties continuously negotiated for a renewal of the franchise.

C.

If they succeed on their Petroleum Act claim, the Carters can recover lost profits that would have accrued had they been able to continue to operate the station after July 1992.9 See Thompson v. Kerr-McGee Refining Corp., 660 F.2d 1380, 1388 (10th Cir. 1981), cert. denied, 455 U.S. 1019 (1982). The disclaimers do not shield Exxon from liability for consequential damages resulting from a violation of the Petroleum Act. In the first place, the language of the disclaimers does not apply to these damages. Paragraph three does not apply because these damages do not"result" from repair. Paragraph twenty-six does not apply because these damages are not based on a claim made "under" the contract. Alternatively, even if the damages were based on a claim made "under" the contract, 15 U.S.C.S 2805(d) provides for the recovery of actual damages. Thus, the damages would be "provided otherwise by law" in accordance with paragraph twenty-six's savings clause. Most importantly, even if the disclaimers did apply, we could not allow Exxon to contract away the protection Congress provided franchisees. See Graham Oil v. Arco Prod. Co., 43 F.3d 1244, 1248 (9th Cir. 1994), cert. denied, 516 U.S. 907 (1995). If the Carters succeed on their

_____

9. The district court did not rule on the damages available to the Carters on the Petroleum Act claim because the court had granted Exxon summary judgment on this claim.

21

Petroleum Act claim, they are entitled to actual damages resulting from the violation. See 15 U.S.C.S 2805(d).

V. Conclusion

We reverse the district court's entry of summary judgment on the Petroleum Act claim and Exxon's counterclaim. We conclude the district court erred in defining waiver for the jury and reverse the judgment on the Carters' state law contract claims. We affirm the district court's holding that the Rental Agreement disclaimer precludes the Carters from recovering business loss on their breach of duty to repair in a good and workmanlike manner claim and its holding that neither the Rental Agreement disclaimer nor the Sales Agreement disclaimer precludes recovery on the Carters' claim for breach of duty to repair in a reasonable time to the extent that business loss accrued before the franchise agreement expired in July 1992. In view of our holdings on the waiver instruction, the damages for breach of contract, and the counterclaim, we believe it is appropriate that the entire case be retried, including the issue of the reasonable time to repair or replace the tanks. See Childers v. Joseph, 842 F.2d 689, 699 (3d Cir. 1988); Heckmen v. Federal Press Co. , 587 F.2d 612, 619 (3d Cir. 1978). We affirm the district court's holdings on all other issues raised. We remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit